**DESIGN AND PRODUCTION, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 553–84C.**

United States Claims Court.

Sept. 14, 1989.

Richard J. Webber, Washington, D.C., for plaintiff.

Stuart James and J. Keith Burt, Washington, D.C., and certain members of the Asst. Atty. General's Office, for defendant.

## OPINION

HORN, Judge.

Plaintiff, Design and Production, Inc. (D & P), filed its complaint on October 26, 1984, pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1982). The case was assigned to Judge Philip R. Miller. In its complaint, plaintiff alleges that defendant, through employees at the Department of Commerce, directed it to perform work outside the scope of the contract. Plaintiff has asked for an equitable adjustment in the contract price.

Prior to filing the complaint in this court, plaintiff submitted a certified, and then an amended certified claim, to the contracting officer on the contract and subcontract at issue in this proceeding. The contracting officer issued a final decision on February 1, 1985, after the complaint in this court had been filed. In his final decision, the contracting officer denied the plaintiff's claim on the basis that all of the claimed additional work was within the scope of the original contract. Subsequent to the filing of pre-trial submissions, plaintiff moved for leave to file an amended complaint in order to clarify that it seeks recovery for all items mentioned in the amended certified claim, including for the amount of the subcontract with the J.A. Jones Construction Co. (Jones), plus overhead expenses and profit. Plaintiff's motion was allowed by an Order of the Court issued, by Judge Miller, on May 16, 1986.

In the amended complaint filed in this court, plaintiff specifies portions of the work performed under the subcontract, which it alleges were outside the scope of its contract with the defendant, specifically to construct demising walls separating the pavilion theaters from adjoining queuing and exit hallways ("the theater walls"), installation of lighting in the theaters, application of acoustical spray to the walls and ceiling in the theaters, and to construct walls and ceilings in the queuing areas adjacent to the theaters. Plaintiff's claim also includes recovery for the cost of the subcontractor's work in constructing the ceiling and doing mechanical work in the projection booth and for installing speaker brackets in the theaters, as well as for insurance, bonds, and permits, purchased by the subcontractor in performance of the subcontract.

Soon after the contracting officer issued his final decision on plaintiff's claim, defendant amended its answer in this court to include a counterclaim based on findings in the contracting officer's final decision. In the counterclaim, defendant alleges that plaintiff failed to supply and install all of the electronic equipment that was called for in the contract. Defendant also alleges that plaintiff failed to fully perform the work agreed to in the contract for exhibit Areas Three and Eight and for the administrative area of the pavilion.

Plaintiff also added claims for additional costs to the subcontractor, namely claims for its own direct costs for construction of the theaters, including adjusted overhead, as audited by the Defense Contract Audit Agency (DCAA) and the agency adjusted amount for general and administrative expenses. Plaintiff also claims a ten percent profit on the contract.

The case was reassigned to Judge Marian Blank Horn. Subsequent to the reassignment, a one week trial was held, followed by extensive post-trial briefings.

After careful consideration of the facts and arguments presented by both parties at the trial and in their written submissions, the court finds, as is discussed more fully below, that the plaintiff is entitled to partial recovery on its claim, but that the defendant is not entitled to recovery on its counterclaim. Plaintiff is entitled to an equitable adjustment for work properly directed by authorized government officers, namely, the construction of the theater walls, some of the acoustical work, painting, installation of the hardware for the theater doors, and portions of the drywall

and ceiling work in the queuing and exit areas. Plaintiff is also entitled to compensation for the Insurance, Bonds and Permits and for general and administrative expenses and a reasonable profit, in accordance with this opinion. All other work for which plaintiff seeks recovery was either required under the contract provisions or was not ordered by an authorized government official.

The work and equipment for which defendant seeks recovery was either not required by the contract, was deleted from the contract requirements by an authorized representative of the government or defendant has failed to substantiate its claim during these proceedings.

## I. BACKGROUND

In the fall of 1982, defendant, acting through the United States Department of Commerce ("Commerce"), solicited proposals to design, fabricate, install, and maintain exhibits for the United States Pavilion at the 1984 Louisiana World Exhibition in New Orleans. Plaintiff and others responded to the government's solicitation. The defendant awarded the initial contract to Designgroup Division of Greyhound, Inc. ("Designgroup"). Shortly thereafter, Designgroup's contract was terminated for default.

After terminating the Designgroup contract, Commerce decided to reprocure the contract by awarding to the next lowest bidder, D & P. At a meeting on March 4, 1983, defendant authorized plaintiff to submit a sole source proposal for the project. On March 28, 1983, D & P submitted to Commerce its "sole source" proposal, which was a firm, fixed price proposal in the amount of $4,265,981, including a cost breakdown and conceptual design summary.

Commerce did not award a contract in response to D & P's sole source proposal because Designgroup, the first contractor awarded the original contract, filed a formal protest against exclusion from the competition for the reprocurement of the work. On the recommendation of legal counsel, the defendant, on May 4, 1983, issued a limited solicitation for competitive bids from Designgroup and from the plaintiff. This solicitation, No. SA–83–SPB–0011, was essentially the same as that issued in the fall of 1982. The difference was that in the second solicitation, the defendant omitted the previous requirement that the contractor provide the movie and projection equipment. Plaintiff submitted cost and technical proposals on May 18, 1983. Subsequently, in response to a request from Commerce on June 3, 1983, plaintiff revised the May 18, 1983 proposals with additional submissions on June 4 and 6, 1983.

On June 7, 1983, defendant awarded to plaintiff the contract, No. TA–83–SAC–02240, which is at issue in this case. The contract incorporates the May 4, 1983 solicitation (with minor exceptions, namely Section A items 1, 2, 3, and 5), and also incorporates the plaintiff's technical proposal, as revised. The contract also incorporates the "Changes" clause from Standard Form 32 (41 C.F.R. § 1–16.901–32, ¶ 2 (1983)), and the "Subcontractor Cost or Pricing Data" clause (41 C.F.R. § 1–3.814–3 (1983)). The cost proposal was not incorporated into the contract. The contract does incorporate by reference the Subcontracting Plan submitted by plaintiff as Section 4 of its cost proposal, dated May 18, 1983. The Subcontracting Plan, however, relates only to the participation of small businesses and small, disadvantaged businesses as suppliers and contractors under the contract. Plaintiff began work shortly after the award.

Several months after Commerce had awarded the contract in dispute in this case, on November 3, 1983, it entered into a lease agreement with Louisiana World Exposition, Inc. ("LWE"). The lease was for construction and use of the building for the U.S. pavilion.

In December 1983, a dispute arose between the parties regarding whether the contract required plaintiff to build the interior walls separating the pavilion's theaters from the adjoining hallways. During the following weeks, the parties discussed the disputed issue, as well as alternative construction designs, as a means of reducing

the cost of the disputed work. In early February 1984, the parties still had not come to an agreement regarding the construction responsibility for the walls. On February 3, 1984, therefore, Mr. Andris Karlsons, the contracting officer for Commerce, wrote a letter directing D & P to implement the theater design which D & P had supplied earlier. This design described construction of the theater walls and ceiling (including the acoustical work), installation of the theater lighting, and construction of the walls and ceiling in the queuing areas.

D & P did not have the ability to do the construction itself. D & P, therefore, subcontracted the work, after competitive bidding, to J.A. Jones Construction, Co. of New Orleans, ("Jones"). After Design and Production, Inc. ("D & P") and Jones entered into a subcontract in March 1984, the scope of the subcontract was modified by change orders, which D & P issued to Jones, between March 29, 1984 and April 24, 1984. Plaintiff alleges that it issued the change orders to Jones at the request of and under the direction of authorized government officers.[1] The work which Jones finally performed and billed D & P for was as follows: construction of the theater walls, installation of electrical lighting in the theaters, application of acoustical wall spray to the walls and ceilings of the theaters and the adjoining hallways, construction of a suspended ceiling in one part of the queuing area, painting and dry wall work in the hallways, installation of handrails in the hallways, extension of the mechanical systems, installation of the ceiling in the projection booth, provision of speaker brackets in the theaters, and the purchase of insurance, bonds and permits.

The pavilion opened to the public on May 12, 1984. On May 13, 1984, Mr. Ogul told Mr. Zuidema, the President at the time of D & P that it was "The best looking U.S. pavilion ever." In Mr. Ogul's final report, he described the exhibition as successful, but during the trial he said that he was "looking through rose-colored glasses" at the time. In his deposition, Mr. Ogul described the exhibitry as "much better than satisfactory".

The Department of Commerce made a final payment under the contract to D & P. Mr. Karlsons wrote "Approved for payment" on the invoice, and then signed it. As the contracting officer, Mr. Karlsons had the responsibility of signing off on D & P's invoices during the latter part of the performance period.

On March 2, 1984, plaintiff submitted a certified claim to the contracting officer for $993,273. This figure represented costs for the work which plaintiff claimed it was required to do beyond the scope of the contract as signed. The plaintiff calculated the amount of its claim from Jones' bid quotation, subtracting the charges for the handrails and installation of doors and frames, plus ten percent for overhead and profit for these items.

By return letter of June 14, 1984, Mr. Karlsons, the contracting officer, stated, "It appears that D & P has some entitlement to payment," but requested further cost details from D & P, which Mr. Karlsons claimed was not received. He reached the conclusion that "it appears that D & P has some entitlement to payment," because of D & P's statement in its May 18, 1983 cost proposal that the price of the contract was conditioned on the government's providing interior partitions. Mr. Karlsons testified that the letter was written by Peter Reese, the contract specialist who replaced Mr. McCarty at the end of May

---

1. For the government, at the start of the contract, Ms. Joyce Cavallini was the contracting officer. During contract performance, Mr. Andris Karlsons became the contracting officer. He remained in Washington, D.C., during the critical times of contract performance. Mr. Terry Chambers was the Acting Commissioner General of Section, Office of World's Fairs and International Expositions in the Department of Commerce and was the signor on the building lease with Louisiana World Exposition, Inc. Mr. James Ogul was the contracting officer's technical representative for the contract and was on site during most times of contract performance. Mr. William McCarty was the Department of Commerce's contract specialist who was responsible for drafting the contractual provisions and for recovery and giving advice on the technical provisions of the contract.

1984. Although Mr. Karlsons indicated that he did not have any input into the words of the letter, he did review it prior to signing it.

D & P supplied additional information and amended its claim, by letter dated July 12, 1984, increasing the amount of the claim to $1,031,306, including overhead and profit. The subsequent change orders for the work performed by Jones under the subcontract and the assessment of liquidated damages accounted for the increase. D & P claimed it did not supply all of the cost details requested by Mr. Karlsons because, it argued, the subcontract was based on adequate price competition which relieved D & P of the subcontractor cost or pricing data requirement, pursuant to the "Subcontractor Cost or Pricing Data" clause, 41 C.F.R. § 1–3.814–3, incorporated into the contract with the defendant. However, D & P did supply to the contracting officer copies of the proposals from the companies which bid on the subcontract, as well as cost breakdowns, the subcontract agreement and amendments, and invoices from Jones.

By letter dated October 10, 1984, D & P notified Commerce that it had not received any response to its claim since the June 14, 1984 letter and that D & P planned to file a claim in the United States Claims Court if it did not receive the contracting officer's final decision by October 22, 1984. In response, by letter dated October 12, 1984, Mr. Karlsons notified D & P that it would receive the Contracting Officer's Final Decision by November 30, 1984, but contended that he still had not received all the information he had requested.

Plaintiff filed this action in the United States Claims Court on October 26, 1984. The case was originally assigned to the docket of Judge Philip R. Miller and, subsequently, reassigned to this Judge.

The contracting officer, Mr. Karlsons, issued a final decision, on February 1, 1985, in which D & P's claim, was rejected with a finding that the construction of the theaters and the related work was within the original contract.

In addition to denying D & P's claim for compensation, in his final decision, the contracting officer also found and asserted that D & P owed the Government a sum of money for failing to provide certain items of video equipment and miscellaneous exhibitry. According to Mr. Karlsons, the February 1, 1985 letter was the first notice D & P received that the government was concerned about delivery under the contract. Shortly after the contracting officer's final decision was issued, defendant amended its answer, filed previously in the Claims Court, to include a counterclaim against plaintiff for the value of the exhibitry which the defendant alleges plaintiff failed to deliver.

The Defense Contract Audit Agency ("DCAA") audited D & P's financial records of the work completed under the contract in dispute. On February 14, 1986, DCAA issued the "Advisory Audit Report on Evaluation of Costs Claimed (Total Costs Excluding Theater Construction and Theater Construction Costs) under Contract No. TA–83–SAC–D2240, Submitted by Design & Production, Inc., Alexandria, Virginia." Of the total costs of the contract, excluding theater construction, the audit questioned $186,563 of the $3,266,931 amount claimed by D & P, but recommended adding $104,107 and $240,115 (for fiscal years 1983 and 1984, respectively) as a result of using a different method for calculating overhead and general and administrative costs ("G & A"). For the theater, D & P claimed $926,773. DCAA questioned $4,025 of overhead, but recommended increasing G & A by $115,074.

Plaintiff subsequently filed a motion for leave to amend the complaint. By leave of the court, plaintiff's motion was granted by Judge Miller on May 16, 1986. *Design & Production, Inc. v. United States*, 10 Cl.Ct. 80 (1986). In the amended complaint plaintiff claimed it is entitled to recover for the full amount of the subcontract as well as its overhead expenses, plus a reasonable allotment for profit, stating that in the construction industry, an allotment of ten percent for profit is standard. In its answer to plaintiff's amended complaint, de-

fendant responded by denying the allegations contained in the amended complaint.

At the trial and in its post-trial briefs plaintiff voluntarily agreed to subtract the amounts from their claims for subcontract work with respect to handrails, projection booth glass, and carpet installation. Plaintiff acknowledged that this work was either never performed by plaintiff or was admittedly within the scope of the contract between plaintiff and defendant.

Based on the DCAA audit report, Ms. Nancy Arnold, a contract administrator for D & P, prepared a revised claim calculation for constructing the theaters, which was admitted into evidence at the trial. Using Ms. Arnold's calculation, plaintiff, for the first time in its post-trial brief, asks to be compensated for all of its own direct costs related to the theater construction. These costs, as submitted to and audited by the DCAA, represent direct labor, overhead, travel, other direct costs, and an overtime premium. In addition, also in the posttrial brief, plaintiff adds the DCAA-approved mark-up for general and administrative expenses, plus a ten percent profit.[2]

The defendant's responsive post-trial brief, as filed, only addresses the scope of the primary contract. Defendant does not address plaintiff's arguments regarding its direct expenses, general and administrative expenses, and profit.

Plaintiff's claim is, in fact, comprised of multiple individual claims for specific items of work allegedly performed by the plaintiff in furtherance of contract performance. The court has chosen consequently to analyze each such claim separately.

## A. PLAINTIFF'S CLAIM
### 1. Theater Walls

While working under the first contract awarded by the government to construct the pavilion, D & P's predecessor, Designgroup, proposed a reconfiguration of the pavilion, which called for two theaters, rather than the single theater which Commerce had originally envisioned when it sent out the first Request for Proposals. According to Mr. McCarty, however, the government premised its acceptance of the reconfiguration on the two-theater design costing no more than the original plan. That design, using two theaters, was later incorporated into the pavilion blueprints.

With Designgroup participating in the negotiations, Commerce reached an understanding with Louisiana World Exposition, Inc., which was to provide the building shell, that LWE would construct the interior theater walls, the walls separating the theaters from the adjoining hallways. However, at the time that Designgroup's contract was terminated, the management of LWE changed, and the new management indicated that they would not construct the walls.

Designgroup, the initial contractor, had selected the firm of Cooper Lecky Partnerships as the architectural subcontractor for the design of the theaters. Although Cooper Lecky had not yet been paid for its work, it had essentially completed the design of the theaters before Designgroup's contract was terminated by the government for default. The design, prepared by Cooper Lecky, called for the arrangement of the theaters as they were finally constructed: dual theaters and walls, separating the seating from the queuing and exiting hallways.

On March 21, 1983, prior to contract award, Ms. Joyce Cavallini, the contracting officer at the time, signed and sent a letter to D & P. At the trial Mr. McCarty testified that he was probably the author of the letter. The letter informed D & P, that it

> will be responsible for the design and fabrication of the interior of the theaters and the design, development of specifications, purchasing, and installation of all items inside the theaters (seats, walls, acoustics, etc).

Arnold also stated that D & P subsequently changed its accounting practice to conform to the suggested method for calculating general and administrative costs.

---

**2.** At trial, Ms. Arnold testified that the government's profit guidelines for fixed price contracts range from approximately ten to fifteen percent, and that plaintiff chose to ask for ten percent because it felt that would be equitable. Ms.

Mr. McCarty acknowledged that this reference to the theater walls was made with the assumption that D & P would use the Cooper Lecky theater design. The March 21, 1983 letter also requested a breakdown of the contract price to enable the government to determine whether the price of each item was fair and reasonable.

In D & P's proposal submitted during the sole source phase, D & P indicated that it intended to use the Cooper Lecky theater design, and included a lump sum cost for the design. On April 6, 1983, D & P submitted a revised preliminary exhibit concept, and on April 13, 1983, D & P submitted a revised cost proposal. The parties stipulated that the revised cost proposal was based on several express assumptions, among which was: "Theater walls, finished drywall, to be supplied by Government." These theater walls were the ones dividing the theaters from the adjoining hallways and although D & P had not yet received the Cooper Lecky drawings, D & P knew which walls it was referring to because an LWE base plan drawing of the pavilion was included with the solicitation sent to D & P by the government.

Commerce provided to bidders on the solicitation, including D & P, the "McNaughton" LWE lease drawings which show the layout of the pavilion to be provided by LWE. The LWE blueprints of the building, called for walls between the theaters and the adjoining hallways and labeled the walls the responsibility of the Department of Commerce. On these drawings there is also a note referring to the interior walls separating the theaters from the adjoining hallways, which shows the floor plan of the theaters which states, "D.O.C. [Department of Commerce] to provide & install interior partitions in theaters A & B."

During the competitive phase (between May 4, 1983 and June 7, 1983), Mr. McCarty received a phone call from Mr. Haroutunian of D & P asking whether it was permissible for D & P to propose using Cooper Lecky even though Designgroup would probably also be proposing Cooper Lecky. Mr. McCarty told Mr. Haroutunian that D & P could do so if it wanted. Mr. Haroutunian also asked whose responsibility it would be to build any walls in the theaters, to which Mr. McCarty replied, if the walls were in the design the contractor presented to the government, then they would be the contractor's responsibility. During a subsequent conversation between Mr. McCarty and Mr. Haroutunian, Mr. Haroutunian asked would D & P be responsible for constructing the walls outlined in the blueprints. Mr. McCarty responded that those walls were only in there because those were old drawings and there was nothing else up to date, and that if the design that D & P submitted included those walls, D & P would be responsible for their fabrication.

In the middle of May 1983, D & P held a meeting to discuss how to price the competitive proposal, in response to the solicitation issued May 4, 1983. During that meeting, Mr. Zuidema, the president of D & P, asked other D & P officers whether the solicitation required D & P to construct the theater walls. Messrs. Smith and Haroutunian told him that there was no requirement in the contract to construct the walls and that the construction of the walls was not a part of the proposal submitted by D & P during the sole source phase. The assembled group then briefly reviewed the relevant sections of the solicitation and satisfied themselves that D & P was not expected to construct the theater walls.

The contract, as signed by D & P and Commerce, incorporated by reference the competitive solicitation and D & P's technical proposal in response thereto. The competitive solicitation contains a brief statement on the scope of work of the contract:

> The contractor, as an independent contractor, and not as an agent of the government, shall furnish the necessary qualified personnel, materials, and facilities to provide final design, fabrication, installation and maintenance of exhibitry in the U.S. Pavilion in accordance with the Statement of Work, Attachment "A" hereto.

The Statement of Work, Attachment A to the solicitation, includes another, more de-

tailed statement on the scope of work. In describing the general requirements of the contract, the scope of work reads, in relevant part,

> The contractor shall develop the final design (drawings and specifications) and acquire and/or fabricate and install all exhibits and thematic components deemed necessary to enhance the United States Pavilion (building to be provided by Louisiana World Expositions LWE).

The solicitation divides the contractor's work into two categories: "Artifacts, displays and graphics," and "thematic support and finishes." In listing the work to be done by the contractor in each category, the solicitation shows the theaters only under the second category (thematic support and finishes), and that reference, which reads "Theater specialties, including seating and acoustical treatment," contains no mention of construction of walls. Moreover, witnesses for both parties acknowledged at trial that the solicitation incorporated into the contract did not contain any specific reference to theater wall construction.

The solicitation organized performance of the contract into four consecutive phases: Phase I, development of exhibit content and submission of a preliminary design; Phase II, development and submission of final detail drawings, plans, and costs; Phase III, acquisition and installation of the exhibits; and Phase IV, maintenance of the exhibits.

In describing the work to be done in Phase I, the solicitation states that the contractor was to research and determine artifact content for the exhibits and to develop designs for fabricated displays, interior thematic treatment, theater specialties, and other specialties. The contractor also was to submit fabrication and installation cost estimates for the artifacts, displays, graphics, thematic support, and finishes.

The technical and cost proposals were submitted with separate letters of transmittal to the government on May 18, 1983. The technical proposal, as incorporated into the contract also does not suggest that D & P was to construct the theater walls. With regard to work in and around the theaters, the technical proposal only states that D & P is to "provide and install acoustical treatments (i.e., acoustical tiles) as required on theater walls; [and] finish projection booth walls, provide and install glass." D & P supplied a performance chart with the technical proposal, which graphically portrays the various tasks D & P was to perform, as well as the proposed time schedule for performance of those tasks. Theater construction is not listed. The technical proposal's project management chart lists the work to be done by D & P's employees and its subcontractors. Cooper Lecky is mentioned under "theater design," but no general or theater construction is mentioned at all. The list of proposed subcontractors also never mentions any firm to build the theaters.

In the category for the theaters, the cost proposal allocated certain amounts to subcontracts for seating, theater design, and design oversight, and to D & P itself for general fabrication and installation. Although the cost proposal mentioned what the cost would be for Cooper Lecky's oversight of fabrication and installation of the theater walls, D & P did not include in their cost proposal any money for the fabrication and installation itself, because D & P was not going to do that portion of the work. The cover letter accompanying the cost proposal stated that the total proposed price of the project was conditioned on Commerce's furnishing of "interior walls, suitable for finish treatment."

While Commerce was issuing its solicitations and D & P was responding with its proposals, the negotiations between LWE and Commerce were going on. In these negotiations, responsibility between Commerce and LWE for constructing the theater walls was in a state of flux. At times, the responsibility was going to be LWE's, and at other times it was not. The LWE lease was finalized several months after the contract between Commerce and D & P was signed. Ultimately, LWE did construct the partition walls in all areas except the theater.

On July 19, 1983, several weeks after Commerce awarded the contract to D & P, a meeting was held with D & P, Commerce, Cooper Lecky, and others present. Mr. Ogul prepared notes of the meeting which were sent to D & P for review. The notes stated that, "theater ceilings are under the scope of the D & P contract, as are theater lighting beyond housekeeping lights and walls inside the shell provided by LWE." When Mr. Haroutunian reviewed the notes he did not take exception to the statement regarding the walls because he understood it to refer to the half-height walls discussed at the meeting as a replacement for the theater ropes and stantions in the queuing area, and, because after the meeting, officials of New Orleans had advised that the walls would not be allowed by the city for safety reasons. Therefore, Mr. Haroutunian thought the statement was moot. Furthermore, D & P never acknowledged any responsibility to construct the walls.

During the development of the theater design drawings by the Cooper Lecky Partnership, Mr. Cooper, of that partnership, was under the impression that LWE would build the theater walls and ceiling. This understanding is substantiated by the cover letter for delivery of the drawings to D & P, dated July 26, 1983.

FIN WALLS AND ACOUSTIC TREATMENT: ... It has been our understanding that LWE agreed (Allan Eskew) to include these walls [which separate the queuing areas from the theaters] at the January [1983] meeting in Washington. D & P would hang the acoustic treatment and decor on these structural divisions. Please note that these are not insignificant partitions, but in reality are major demising walls between different fire zones. The continental seating depends on fire separation at the line of these walls.

CEILING TREATMENT: It was our understanding that LWE would provide a surface on which D & P would hang the acoustic and decor treatment of the theater.... In the near future we will want to coordinate the location of lights and diffusers. Please note that this ceiling seems to be required to form the return air plenum, so it obviously was considered to be an LWE provided element (as agreed in January) in order to make the theater mechanical system work.

However, Mr. Cooper testified that, at about the time the contract was awarded, he understood that there was a shift in the lease negotiations. By mid-August, 1983, he knew that there was a dispute going on, and it was not clear to him who was going to build the walls.

Between June and November, 1983, after award of the contract and when the dispute arose as to who would build the theater walls, D & P supplied construction information to Commerce. D & P provided construction estimates to the government for theater walls, because D & P recognized that providing design information was within the scope of D & P's obligation to design the theaters. D & P also discussed with Commerce the construction materials necessary for the walls because the government was interested in soliciting donations or involving U.S. industries, and in providing LWE with engineering studies and calculations on the weight of the walls necessary to construct the theater floor.

In an August 25, 1983 technical report to Commerce, D & P noted that it had forwarded to Commerce the Cooper Lecky plans for the theater scheme and details for the finished walls. Responding to this report, Mr. Ogul wrote a letter, dated October 3, 1983, to Mr. Scully of D & P, stating that the theater schemes had been forwarded to LWE. Similarly, D & P forwarded to Commerce the Cooper Lecky drawing showing the theater layout, including the interior theater walls. When D & P received shop drawings (the final, construction drawings) from Cooper Lecky, which suggested a way to save cost in the construction of the walls, it forwarded the drawings on to Commerce.

As Commerce prepared for the final negotiations for entering into the lease for the building from LWE, which was executed on November 3, 1983, a list entitled "Suggested Responsibilities to be Transferred to LWE" was prepared in a joint meet-

ing between D & P and Commerce. One of the items was "LWE to provide walls inside theater for DOC contractor to finish." At a meeting in late November 1983 attended by LWE, D & P and Commerce, D & P was informed that neither Commerce nor LWE was going to construct the theater walls.

At the Phase II review meeting for Commerce, D & P and Barry Howard & Associates (a subcontractor to D & P, responsible for oversight of design), held on November 28, 1983, Mr. McCarty, was told for the first time that D & P would need additional money to complete the project. At that meeting, D & P said that it would need an additional $200,000 to $350,000 to build the items required under Phase II of the contract, and an additional $200,000 plus to build the theaters. Mr. McCarty responded that D & P had plenty of time between Phases I and II in which to design something within the cost of the contract.

It appears that following the Phase II meeting, D & P personnel reviewed what it would cost if they were directed to build the theater walls. A D & P interoffice memo on a meeting held December 12, 1983, noted that the ordering of the steel studs for the interior theater walls would be "a real problem." It usually took a long time to get the steel studs, and because they had not yet been ordered, Mr. Haroutunian understood that it would be expensive to get them in time.

On December 15, 1983, D & P sent a letter to Commerce giving estimates of the cost of various changes which might result from the Phase II meeting on November 28, 1983. Those estimates included $250—300,000 for the theater interior construction, required due to the failure of LWE to furnish adequate structure as indicated in the attachment to the solicitation, $200—250,000 increase in cost for construction in the exhibit areas, due to unavailability of the building, $40—50,000 for computer equipment, not donated, and $250—300,000 for exhibitry. The computer equipment not donated refers to the government-furnished computer equipment that the solicitation stated would be available from the

1982 U.S. Pavilion located in Knoxville, Tennessee.

Mr. McCarty apparently indicated that the Cooper Lecky design for the theater and the Phase II designs for the exhibitry were going to be rejected because the plans exceeded the contract price, and that D & P had to redesign everything so that the exhibits and theaters could be built for the contract price. However, according to Mr. Zuidema, Mr. McCarty added that Commerce would consider compensating D & P for additional costs resulting from LWE's delays.

By letter, dated January 19, 1984, Commerce responded to D & P's December 15, 1983 letter, in which D & P identified various items as exceeding their budgeted costs. One item identified by D & P was "theater interior construction, required due to failure of LWE to furnish adequate structure as indicated by attachment to contract RFP [request for proposal]." Regarding this item, Mr. Karlsons, the contracting officer, responded as follows:

> Your contention that the RFP drawings did not show interior partitions in the theater [as a responsibility of the contractor]; therefore, the partitions are not your responsibility is irrelevant. D & P's contract responsibility is to design, construct and install all necessary items (except the [movie] screens) to make those theaters visually and acoustically acceptable for an audience.... Furthermore, the partitions in question are a part of a design that you submitted to the government. Therefore, if the partitions are causing a problem for you it is up to you to solve the problem with the government's approval.

Thus, it had become the government's position that D & P had to construct anything that was in the designs it submitted.

During January and February 1984, D & P initiate discussions with Commerce regarding less-expensive alternatives to the original Cooper Lecky design. According to the contracting officer, Commerce gave D & P the opportunity to submit an alternate design because the original design

was going to be expensive, and D & P was hesitant to proceed with the construction.

In January 1984, a meeting was held with representatives of D & P, Commerce, Cooper Lecky, and Guggenheim, the producer of the films to be shown in the exhibition. Discussions focused on alternate theater designs, such as eliminating the ceiling or the interior walls. D & P indicated it would work on these ideas to see whether the cost of construction could be reduced. D & P issued a change order in late January to Cooper Lecky for assistance in modifying the theater design.

On January 31, 1984, D & P proposed, in a letter to Commerce, an alternate theater design without walls separating the theater seating from the queuing areas. Mr. Karlsons responded, by a letter, dated February 3, 1984, rejecting the alternate design and directing D & P to proceed with the ordering of materials, fabrication, installation, and other work necessary to construct the theaters. The letter indicated Commerce's conclusion and position that the construction of the theater walls was D & P's responsibility under the contract. In the letter, Mr. Karlsons explained that he rejected the alternate design drawings because they were determined by Mr. Ogul to be incomplete, not acoustically engineered, not reviewed for life safety, and because there was not time, given the scheduled opening of the pavilion, to review and correct the new proposals, if necessary. Mr. Ogul testified at trial that the alternate design was rejected because it was opposed by Guggenheim, the film producer, and because Mr. Ogul relied on Guggenheim's expertise and recommendation. D & P, therefore, in the February 3 letter, was directed to construct the theaters according to the January 17, 1984 design (the original Cooper Lecky design), including interior walls. D & P proceeded to construct the theaters as directed, under protest.

Mr. Karlsons stated in his February 3, 1984 letter that this letter constituted the Contracting Officer's Final Decision for purposes of appeal to the appropriate Board of Contract Appeals or to the United States Claims Court. However, D & P did not consider this letter to be a final appealable decision because it had not been issued in response to a certified claim. Instead, although Mr. Karlsons indicated that he did not intend that the letter be a change order, D & P considered it a constructive change. D & P subsequently submitted its certified claim to the contracting officer by letter dated March 2, 1984.

In a meeting on February 9, 1984, Mr. Zuidema and Mr. Wright of D & P and Department of Commerce personnel, Mr. McCarty, Mr. Ogul, Ms. Grinvalds, and Mr. Johnson, discussed reducing the cost of constructing the pavilion. It was agreed to simplify the ceiling and the demising walls, while retaining the original placement of the walls.

Mr. Zuidema took notes of the February 9, 1984 meeting, in which he stated,

> It was agreed that the ceiling requirements as shown in the Cooper Lecky drawing could be significantly simplified. We can treat the ceiling with some type of banners versus the suspended insulation ceiling now shown. That will eliminate the requirement to drop sprinkler heads in the theaters below the suspended ceiling. Jim Ogul will send us a letter authorizing that change, but requested that we not wait for that letter to get started if there was construction we could accomplish in the ceiling.

According to Ms. Grinvalds' notes of the meeting between D & P and Commerce on February 9, 1984, D & P agreed to proceed with wiring and installation of lights, coordinating the work with LWE.

After the February 9, 1984 meeting, D & P had further discussions with Commerce on reducing the cost of the pavilion and obtained the help of Cooper Lecky in redesigning the theater. After the February 9th meeting, Mr. Karlsons sent Mr. Zuidema a letter dated February 21, 1984, advising D & P that the government would be receptive to any idea to reduce the cost of performing the work inside the theaters. Another letter from Mr. Karlsons, dated February 21, 1984, notified D & P that it had until March 5, 1984, by which to obtain

government approval on any redesign decisions.

Lacking the personnel and equipment to do the construction itself, plaintiff prepared to subcontract the work. Construction Control Services (CCS), a construction management firm and general contractor, had already been retained by D & P to do such things as install and connect the exhibits sent to New Orleans, and some wiring, plumbing, and painting. The only work CCS was to do in the theaters was the installation of the seats and screens. In February 1984, D & P enlisted the help of CCS to provide construction management for D & P's general construction work in the theaters. Mr. Harrell, the managing partner of CCS, worked with Mr. Scully of D & P.

D & P solicited bids for construction of the theaters in a letter dated February 15, 1984. The letter included the Phase II Cooper Lecky drawings, which was the original Cooper Lecky design. Bids were obtained from J.A. Jones Construction Co. from Claiborne Builders, a general construction firm in New Orleans, and from Barlows, Inc., a general construction firm in the Washington, D.C. area, as well as an oral bid from Construction Control Services.

CCS solicited the bid from Claiborne at the request of D & P to contact another construction company in New Orleans. Mr. Harrell contacted Claiborne because it was a reputable firm and one of the very few firms not involved in the Fair who had workers available. At the time, Claiborne was providing carpenters to Construction Control Services in CCS' exhibit work for D & P because CCS didn't have enough staff. Claiborne submitted an arms-length, competitive bid. Claiborne was not related to CCS and had not had dealings with CCS before.

D & P approached Barlows, Inc. directly about bidding. Barlow had previously worked with D & P's parent corporation, but not with D & P. The Barlow quotation was an arm's length competitive bid based on the total drawing package. While, Cooper Lecky contacted Jones for D & P, so that Jones would be less likely to know that a change order was involved. D & P thought this approach would enable them to achieve a more competitive price.

D & P asked Construction Control Services to work up pricing information for construction of the theaters and also to look for ways to reduce the cost. CCS prepared an average price budget based on information contained in Means Construction Cost Manuals and knowledge obtained about the local economy. All of the bidders suggested ways to reduce the total cost.

A meeting was held in February, 1984 between D & P and Commerce to discuss one of the subcontracting bids D & P had just received. Mr. Zuidema again raised the question of using the alternative theater design and eliminating the demising walls. He argued that no one had raised any substantial objection to the alternative design, except for the film producer's dislike and uncertainty as to whether it would be acceptable to the building code board for the City of New Orleans. Toward the end of the meeting, the representatives of Commerce decided that, if they could get the concurrence of Mr. Chambers, they would authorize D & P to use the alternative design which had been previously submitted and rejected. Later that day, Mr. Zuidema of D & P received a message from Mr. Ogul indicating that Mr. Chambers had decided that the alternative design was still unacceptable and that D & P should go ahead with the design as previously authorized.

At a meeting with Commerce representatives on February 27, 1984, D & P proposed some cost and time saving changes to simplify the construction, while retaining the approved design: a single layer of gypsum board (5/8 inch thick) on each side of the theater walls, instead of a double layer on each side; acoustical foam sprayed on the inside of theater walls, (down to the 8–foot level), on the inside of the building skin walls, and on the inside of the roof; a short drywall barrier wall in front of the screen, instead of the stage; and some additional drop lighting, instead of the accent lighting.

On February 29, 1984, Messrs. Wright and Nichols of D & P and representatives of Cooper Lecky and CCS met with the two lowest bidders, Claiborne and Jones, to discuss methods of reducing the total cost of construction, to confirm April 16 as the completion date for the theaters, and to answer any questions. On March 1 and 2, 1984, D & P obtained revised bids based on these changes from the two lowest previous bidders: Claiborne and Jones, respectively. The Claiborne and Jones bids were arm's length, competitive bids.

Award of the subcontract was made to Jones, based on total price and the fact that they were the existing general contractor in the U.S. Pavilion. A letter of intent was given to Jones on March 2, 1984, to proceed with the project.

The contracting officer's final decision was issued on February 1, 1985, in response to D & P's certified claim contained in the letter dated March 2, 1984, as revised on July 12, 1984. The decision was issued after a trip Mr. Karlsons took to New Orleans on about October 15, 1984, in which he discussed with various individuals from Commerce, including Messrs. Ogul, Dale Larkin (Mr. Karlsons' boss at the time), and Jerry Walls from the office of General Counsel, D & P's reservation, included in its May 18, 1983 cost proposal, that the price was conditioned on the furnishing by Commerce of "interior walls suitable for finish treatment" and which Mr. Karlsons decided to disregard when he issued his final decision.

On page 2 of the final decision, Mr. Karlsons mentioned that one of the documents which influenced his decision was D & P's supposed application for building permits as well as a request to install continuous seating from side to side without aisles, although he did not seem to know whether a building permit is the same as a construction permit. Mr. Karlsons stated that the first indication that "the theaters are not D & P's responsibility does not come until March 2, 1984." In so saying, Mr. Karlsons appears to have been referring to the first written notification, since disagreement on this issue was discussed during meetings held in December 1983 and January 1984.

2. Electrical Work—Lighting

On March 21, 1983, during the sole source solicitation phase, Ms. Joyce Cavallini, the contracting officer at the time, sent a letter to D & P which stated that LWE would

provide all electrical requirements. You [D & P] must provide LWE with your requirements, (electrical loads, location of junction boxes, conduit requirements for electricity and signal cabling).

One of the assumptions articulated by D & P in its sole source proposal, however, was: "Electrical conduit to be supplied by Government." Moreover, in the solicitation issued subsequently as part of the competitive solicitation and which was incorporated into the contract the following language appears:

Special incandescent lighting shall be provided in the exhibit areas, the Source [3–D] Theater and the main circular ramp to support the character and functions of these areas and to enhance the displays and graphics therein. Fluorescent lighting in these spaces shall be limited to general background illumination. (NOTE: We assume background lighting will be provided by LWE as part of the building).

. . . . .

The contractor shall furnish and install all electrical equipment, devices, fixtures, lamps, wiring, mounting assemblies, interconnectors, and services required to perform all electrical work where lighting is indicated, within all transparency light boxes, wherever electrical work as [sic] required by the drawings and/or herein specified.

To assist the contractor, the solicitation indicated that lighting fixtures from the U.S. Pavilion at the Knoxville World's Fair would be available as government-furnished equipment.

D & P's plan for lighting in the pavilion, as set forth in its technical proposal, was to reuse the Knoxville incandescent lighting fixtures being offered as government-fur-

nished equipment. D & P also had been the exhibit fabricator for the government at the Knoxville World's Fair. D & P planned to take out LWE's fluorescent lighting, and reuse the wiring, conduit, and junction boxes provided by LWE with the Knoxville incandescent fixtures.

By letter dated June 3, 1983, Commerce asked what use D & P would make of non-computer items from Knoxville. In response, D & P submitted a letter, dated June 4, 1983, revising its technical proposal and which, as revised, was incorporated into the contract. In the letter D & P stated its intention to use virtually all equipment available from the Knoxville Pavilion, including all lighting fixtures. In fact, in preparing the cost proposal D & P did not include a separate amount to cover the cost of lighting in the theater.

On May 3, 1983, Mr. Haroutunian, Mr. Ogul, Ms. Anita Grinvalds, and others from Commerce and Mr. Guggenheim met at Guggenheim's office to discuss the theaters. A report of that meeting, prepared by Mr. Ogul, records the following items of discussion:

> There is a possibility of Colortran, Inc. loaning dimming sets for the theaters. Alvis Wales is the contact. (This appears to be D & P's responsibility) Dimmer would require low voltage remoting. D & P would install, but it would be better if LWE did it, per Haroutunian.
>
> . . . . .
>
> 4. Theater lighting: Fluorescent light fixtures have been removed and drawing showing deletions has been forwarded to LWE. D & P will provide and install incandescent down lights, aisle lights, and some screen wash lights, all on dimmers.

On August 19, 1983, Mr. Haroutunian sent a letter of clarification in response to Mr. Ogul's notes of the meeting. Mr. Haroutunian specified that D & P's plans for the theater did not call for dimmers, and that prior to the August 3, 1983 meeting, D & P had suggested that LWE remove the fluorescent lighting in the theater, provided that this would not cause any problems with building code violations, and upgrade the wiring for incandescent lighting. D & P intended to provide incandescent lights used in the Knoxville pavilion. At the trial, Mr. Haroutunian testified that D & P never said it would install the wiring for an incandescent system, nor expressed a willingness to provide aisle lights and screen wash lights.

LWE, did not install the fluorescent light system in the theaters because Mr. Guggenheim, the film producer, asked that it not be installed. LWE did install wiring for the fluorescent system. Although D & P had requested, through Commerce, that the system installed be compatible with the incandescent system D & P was to install, the wiring LWE installed could not be used for D & P's incandescent lights because it was for a different type of fixture.

At the February 27, 1984 meeting with Commerce, one of the cost saving changes to the Cooper Lecky design which D & P suggested was to install some additional drop lighting in the theaters, instead of the accent lighting. The changed lighting system was bid on and then installed by Jones as a part of its subcontract with D & P. No change orders were issued by the government to D & P which affected work on the lighting system. However, under the subcontract, between D & P and Jones, Jones agreed to complete the lighting in the theaters by April 16, 1984, and agreed to pay liquidated damages of $2,500 per day of delay. In its April 30, 1984 invoice, Jones acknowledged that the electrical and lighting work was not completed until April 23, 1984. Therefore, Jones reduced its bill to D & P by $17,500.

### 3. Acoustical Work—Including Acoustical Spray, Carpet, Painting [3]

During the time Commerce was dealing with D & P as a potential sole source bidder on the project, the contracting offi-

---

**3.** The claim for acoustical ceiling work is discussed below in a discussion of additional claims affected by change orders.

cer sent a letter dated March 21, 1983, to D & P. The letter informed D & P that it would be responsible for, "the design, development of specifications, purchasing, and installation of all items inside the theaters (seats, walls, acoustics, etc)."

As described above, the solicitation, incorporated into the contract, divides the contractor's work into two categories: "Artifacts, displays and graphics," and "thematic support and finishes." In listing the work to be done in the second category, the solicitation mentions, "Interior thematic treatment, including carpeting, ramp finishes and painting" in the main exhibit areas. Regarding the theater and queuing areas, the only work listed is theater specialties, including seating and acoustical treatment and crowd control accessories. In further discussing "acoustical treatment," the solicitation section on Material and Construction states: "The 3–D Theaters. Acoustical treatment, including sound baffles and other controls, shall be designed in coordination with the audio/video design to provide both acoustical and visual support for the theater presentation."

In its technical proposal, also incorporated into the contract, D & P stated that it would "provide and install acoustical treatments (i.e., acoustical tiles), as required on theater walls." In the queuing areas, D & P's responsibilities were "to provide design services as required, as well as providing crowd control railing systems and appropriate directional graphic materials." The work of finishing the walls and ceilings in the theaters and queuing areas was not mentioned.

In its cost proposal, D & P allocated $36,785 for labor and material to do its "fabrication and installation" work in the theaters. This was to cover the provision and installation of acoustical treatments promised in the technical proposal. For work in the queuing areas, the design oversight fee was set at $1,700 and crowd control work at $5,000.

With respect to acoustical work, a report prepared by Mr. Ogul of the August 3, 1983 meeting between Mr. Haroutunian, of

D & P, Mr. Ogul, Ms. Anita Grinvalds, and others from Commerce and representatives of Guggenheim stated the following:

2. Acoustical ceiling in theaters: D & P is providing acoustical ceilings. Cooper Lecky ceiling design in [sic] aesthetically acceptable to Guggenheim. Concern expressed about air return grates and finish work needed to complete air-return system—this should be done by LWE (Ogul has discussed this with Hertel and he has agreed to have LWE pay for air return grates). ...

At the February 9, 1984, meeting between various representatives of Commerce and D & P to discuss reducing the cost of constructing the pavilion, according to Mr. Zuidema's notes of that meeting, it was agreed that the ceiling requirements as shown in the Cooper Lecky drawing could be significantly simplified. Instead of the drop ceiling, D & P would treat the ceiling with banners. Mr. Ogul promised to send a letter authorizing this change, but asked D & P not to wait if there was construction which could be accomplished on the ceiling.

Additional revisions were discussed while the subcontractor bidding was going on. At a meeting on February 27, 1984, D & P proposed a series of modifications, including to the amount of acoustical work, to the Cooper Lecky plan in an effort to reduce cost and expedite construction. Guggenheim, the film contractor and Commerce's technical consultants on theater acoustics, approved D & P's suggestions. D & P was then to price out these changes with the potential subcontractors, and Commerce promised to "expedite approvals."

As finalized in the Revised Project Scope submitted on February 29, 1984, in response to the contracting officer's request for additional information on D & P's claim, D & P indicated that the subcontractors' bids were based on the following changes to the Cooper Lecky plan. Instead of two layers of dry wall on each side of the theater walls, only one layer was used, but two and a half inches of acoustic spray were applied to the theater-side of the walls down to the eight-foot level above the

floor, one inch of spray was applied to the queuing-side down to the eight-foot level. Furthermore, two and a half inches of spray were applied to the ceiling in the theaters and one inch of spray was applied to the ceiling in the queuing and exit corridors. Carpet was to be applied to the walls inside the theater below the eight-foot level. However, the final change order, issued by D & P to its subcontractor, Change Order "E" dated April 24, 1984, deleted the requirement to install carpet on the inside theater walls, reducing the subcontract by the full amount of this category, $6,968.

The queuing side of the theater walls below the eight-foot level and the full height of the inside of the exterior walls were to be painted. The theater doors and frames and the various metal trim pieces were also painted. The finish of the walls in the queuing and exit corridors was modified by later change orders, which are discussed below. Other than the carpet installation, Jones did all of the work to finish the ceilings and walls in the theaters and adjacent hallways.

### 4. Hardware and Door Installation

One of the components of Jones' bid to construct the Cooper Lecky design for the theaters was for labor for the installation of the doors to the theaters and the accompanying finish hardware. The cost for this work, labeled "Hardware" in Jones' invoice to D & P, was $2,560.

Although the Revised Project Scope, dated February 29, 1984 and submitted to the contracting officer in support of plaintiff's claim, stated that this installation work was not to be done by D & P or its subcontractors, nonetheless, the March 7, 1984 theater specifications designed by Cooper Lecky for its revised project drawings, included the door and hardware installation as a responsibility of the subcontractor. The installation work was also listed in Jones' revised quote dated March 2, 1984.

One of the change orders which D & P issued to Jones directed Jones to delete the labor to install the doors for the theater, reducing the subcontract by $1,280. D & P's representative at the pavilion, Mr. Wright, testified that, originally, LWE was going to provide the doors and D & P was going to install them, but LWE elected to go ahead with the installation themselves.

### 5. Insurance, Bonds, and Permits

The subcontract between D & P and Jones, dated March 5, 1984, required Jones to obtain insurance and bonds in conjunction with its execution of the Cooper Lecky plan. The subcontract specified that "Certificates of Insurance issued by the subcontractor's insurance carrier shall be forwarded to D & P prior to commencement of work. At a minimum, the coverage shall include Workman's Compensation, General Liability ... and Comprehensive Automobile Liability. Provide both the performance and payment bonds to D & P prior to commencement of work on site." Jones acquired the required coverage for $18,068.

### 6. Additional Claims Affected by Change Orders Issued by D & P to its Subcontractor

After Jones entered into the subcontract with D & P, several changes to the contract were ordered by D & P. The government does not dispute that the change order work at issue here is outside the scope of the contract. D & P contends that these changes were made at the request of responsible government officials, at whose request D & P issued change orders to Jones. These change orders initiated types of work from Jones which had not previously been included in its subcontract, finish work in the theaters' projection booth and installation of speaker brackets in the theaters. Other change orders modified the finish work Jones was already doing in the queuing areas.

#### *Projection Booth*

No mention is made of the theaters' projection booth in Commerce's solicitation, No. SA–83–SPB–0011. In its technical proposal, D & P stated that it would "finish projection booth walls, provide and install glass." In the cost proposal, D & P set aside $3,500 for the glass. No work in the projection booth is mentioned in the D & P's Revised Project Scope, dated February

29, 1984, on which the subcontractors based their bids.

In the March 7, 1984 "Theater Specifications" prepared by Cooper Lecky, regarding the subcontract work generally, it was stated that, "[a]ll mechanical work [heating, ventilation, and air conditioning systems] shall be provided and installed by others."

One of the change orders which D & P issued to Jones required work in the projection booth. One item on Change Order "B," dated April 6, 1984, directed Jones to finish the theaters' projection booth. This included installation of a drop ceiling, lighting, glass and glazing, and extension of the mechanical systems, at an added cost of $13,650. Jones' subcontract did not include any modifications to the mechanical systems nor glass installation, but the subcontract did cover painting the walls and providing and installing the glass. Mr. Wright, of D & P, testified that he was given a drawing to put in a drop ceiling and to extend the mechanical systems. He said he talked with Mr. Ogul about this, and was directed to make the changes.

### Speaker Brackets

During the sole source phase, the contracting officer advised plaintiff in a letter, that "[t]he fabrication and installation of frames and the installation of speakers are also your responsibility." The speakers were to be provided by the film contractor. Despite this preliminary assertion, no language to this effect found its way into the contract between Commerce and D & P.

The report prepared by Mr. Ogul of the August 3, 1983 meeting between Mr. Haroutunian, Mr. Ogul, Ms. Anita Grinvalds, and others from Commerce and Guggenheim stated the following:

> Cabling of loud speaker wires and mounting speakers. Guggenheim will provide mounting detail to D & P and D & P will do.

One of the items in Change Order "B" ordered Jones to install twenty speaker brackets in the theaters, at a cost of $6,000. The speaker brackets were not identified in the drawings, but were specified by the film maker. After inquiry, D & P claims it was told by the "government" that anything not supplied by the film maker or LWE was D & P's responsibility.

### Acoustical Ceiling

At the February 27, 1984 meeting, several of the cost saving changes proposed by D & P concerned the work in the queuing areas. The "Revised Project Scope: February 29, 1984," in support of plaintiff's claim to the contracting officer, sets forth the plan on which the potential subcontractors based their final bids. One of the items in the revised project scope was a suspended acoustic-tile ceiling. This was installed in the queuing area between the queuing corridors and the rest of the pavilion, called "Queuing 9." This item is listed on Jones' invoices as "Acoustic Ceiling." The cost was $12,700.

### Fire Sprinkler Heads and Mechanical Systems

The first item on Change Order "A," dated March 29, 1984, amended the original agreement between D & P and Jones by directing Jones to extend the fire sprinkler heads and HVAC (heating, ventilation, and air conditioning) duct work (called "mechanical systems") through the drop ceiling in the queuing area 9. This work cost $10,000. Mr. Nichols, a D & P Purchasing Manager, in an April 30, 1984 interoffice memorandum analyzing the change orders, stated that the alternative would have been to delete the ceiling and apply acoustic spray to the ceiling area at a cost, according to Jones, of $16,000. These mechanical systems were not a part of the original drawing package or agreement between Jones and D & P. Mr. Wright testified that it was his understanding that the placement of the mechanical systems was the responsibility of the installer of those systems, and not a part of D & P's work. He discussed this with a government official (he thinks it was Mr. Ogul), who took the position that D & P was in there too late to have others do it. Mr. Wright testified that D & P was directed to complete this work. Thereafter, plaintiff requested

a change order from the government to cover this work. Mr. McCarty wrote the letter of response, dated April 13, 1984, rejecting the request and arguing that it had been Mr. Wright who decided to install the drop ceiling (instead of spraying the existing ceiling) as a means of saving money, and that Mr. Wright had made this decision after the mechanical systems were already in place.

### Exterior Walls in Queuing Corridors

Item 3 on change order "A" directed Jones to "eliminate painted wall above eight feet on the exterior precast walls" in queuing and exit corridors and to cover the exterior walls with one inch of acoustic spray, at an added cost of $12,260. Mr. Nichols stated in his April 30, 1984 memorandum, and Mr. Wright testified at trial, that this change was directed by the government at the request of the film maker, Guggenheim, because it was needed to dampen the sound from the bare concrete walls.

According to Mr. Wright, after the acoustical spray had been applied to the full height of the exterior walls, Mr. Chambers determined that some cover material needed to be installed over the spray. Thus, D & P issued Change Order "C," dated April 12, 1984, directing Jones to construct a gypsum wall along the concrete exterior walls in the queuing and exit corridors to a height of eight feet, at a cost of $17,000. Mr. Nichols noted that Claiborne, the competing subcontractor, had bid $24,000 to construct gypsum walls in the queuing and exit corridors.

### Dry Wall Casement

When Mr. Chambers noticed a pipe which ran from floor to ceiling at about two and a half feet from the wall in one of the queuing corridors, he directed D & P to make the pipe "look good." To accomplish this, plaintiff issued change order "D," dated April 24, 1984, which directed Jones to build a drywall casement around the pipe and to build a similar structure in the queuing corridor for the other theater. The cost for this work was $500.

## B. DEFENDANT'S COUNTERCLAIM

In its counterclaim, defendant alleges that plaintiff failed to deliver all of the electronic equipment specified for the exhibits and failed to complete the work it had contracted to do in exhibit Areas Three and Eight and in the administrative area.

### 1. Electronic Equipment

The solicitation directed the contractor to use "state-of-the-art interactive computer/video technology distributed throughout the display areas." To assist the contractor in acquisition of electronic equipment, the solicitation listed many items of computer hardware to be available as government-furnished equipment. The solicitation also mentioned that there was a possibility that Apple Computers Inc., Sony Corp., and other manufacturers would donate or loan equipment for the pavilion. The contractor was cautioned, however, that it would have to cover the cost of replacement equipment if the donations were not made.

In the introduction to its technical proposal, D & P qualified the proposal by stating, "[i]n reviewing our thoughts, please keep in mind that they remain highly conceptual and need to be validated through the normal schematic design effort." According to Mr. Haroutunian there was not enough time before the award of the contract for D & P to prepare for inclusion in the proposal a final design for all of the exhibitry, and D & P did not want to try to do so without review and comments from the government.

The main section of D & P's technical proposal describes the exhibit areas of the pavilion, explaining the content and purpose of each area, without stating what equipment or exhibitry D & P intended to use. A separate section, however, was included specifically describing D & P's planned computer/video disc system. In the overview to this section, D & P explained that it intended to use essentially the same hardware system utilized in the Knoxville Fair: Apple computers, Sony monitors and video disc players, and Elographics touch sensitive displays, along

with the government-furnished video equipment described in the solicitation. During its use at the Knoxville Fair, this equipment had proven to be reliable and D & P and its associates were already familiar with the equipment. Furthermore, D & P was familiar with the software design requirements and maintenance needs of the Apple/Sony system, and already had some of the support hardware and software for it. D & P's intent to use the government-furnished computer equipment was reiterated in the June 4, 1983 letter, revising its technical proposal, which was incorporated into the contract.

The section of the technical proposal on the computer-video systems gives some detail regarding the systems to be used in Areas Four, Five, and Six. Plaintiff planned a three-screen video debate system for Area Four. To operate this system, plaintiff suggested using three large television monitors, a video disc player, a touch sensitive display, and a computer. The activities of various federal agencies in soil and water conservation were to be presented in one part of Area Five, using two "video towers" with interactive touch sensitive displays.[4] A water management theater was to be presented in another part of Area Five, using two projection televisions and a polling system. In Area Six, plaintiff planned a Water Arcade with sixteen interactive displays, each composed of a touch sensitive display, computer, and video disc player. The interactive displays were to be grouped in clusters of four, and each cluster was to have a large video projector to display the contents of one terminal to a wider audience.

A performance schedule chart was included in the technical proposal and revised by the June 4, 1983 amendment to the proposal. As revised, D & P planned to conduct "research, concept design" from June 15 to July 15, 1983, followed by "hardware selection, system development, sponsorship, [and] system integration" from July 15 to September 30.

The cost proposal contains the listings by quantity and cost for the computer and video disc hardware which D & P proposed for Areas Four, Five, and Six: a total of 24 video disc players, 24 computer systems, seven video projectors, 26 monitors, and 25 touch sensitive displays, totalling $300,000 in cost. This was an estimate, "an order of magnitude" according to Mr. Haroutunian, of the number of various items of computer and video disc hardware that were to be used in those areas.

The cost proposal also indicates that D & P anticipated producing five video discs. The cost of film acquisitions, rights and approvals; script; editing, transfer and tape; music and narration; and video mastering for the video disc masters was estimated at $350,000. Under a list of "Hardware and Equipment" D & P stated its plan to provide two hard disc drives ($10,000), a "[c]ustom interface system for computer/video disc/polling stations in theater" ($15,000), and custom electronics for the debate area ($3,000).

By letter dated August 3, 1983, Mr. Ogul, as Director of Exhibits, notified D & P of Commerce's approval of D & P's work for phase I of the contract. A minor stipulation was added, that D & P provide a more detailed conceptual plan for the interactive computer-video systems.

In response to a request for clarification of D & P's position in regard to the budget and Phase I deliverables, Mr. Scully, then president of D & P, responded in a letter dated August 31, 1983. Mr. Scully stated that, while D & P intended to fulfill its responsibilities, at that stage of development it was impossible to assign an exact dollar value to the various elements of the exhibits. Mr. Scully also noted that:

> [s]hifts may also have to be made between exhibit areas as the educational value of elements are evaluated against the overall theme of the pavilion. Such shifts in emphasis, should they become necessary, will be made with the Contracting Officer's Technical Representative.

Mr. Scully further noted that the anticipated donation of equipment from Apple and

---

4. The proposal does not explain what is meant by "video towers."

Sony would allow the scope of the exhibits to be increased beyond the requirements of the contract.

Although the solicitation stated that Apple and Sony might donate some equipment, neither company made any donations. D & P ultimately purchased Apple computer equipment and used video disc equipment donated by the RCA corporation.

Some time after Mr. Scully's August 31 letter, an official from Commerce, either Mr. Ryder or Mr. Ogul, informed D & P that RCA wanted to donate some television monitors and video disc players for the pavilion. Mr. Haroutunian told Mr. Ogul and Mr. Ryder (who was senior to Mr. Ogul on the Pavilion staff) that D & P did not want the donation because D & P personnel felt that it would not save money, and that it would cause D & P to incur extra expenses in making the RCA-donated equipment work, since RCA's television monitors performed more poorly than the planned Sony equipment, and the reliability of RCA's video disc players was uncertain. Nonetheless, D & P was forced to use the RCA equipment because the donation had already been accepted.

Much of the government-furnished equipment offered in the solicitation could only be used with Sony video equipment, and therefore, could not be used with the equipment received from RCA. Although some new video programming had to be created, use of the RCA equipment also required D & P to do more work in the creation of software to control the video programming.

Between the award of the contract and the opening of the pavilion, changes were made in the plans for the exhibitry which later became the basis for defendant's counterclaim against plaintiff for exhibitry never delivered and work never performed. According to Mr. Haroutunian, the changes took place mainly during Phases I and II. Mr. Haroutunian met with various persons from Commerce, depending on the subject of the change to be discussed: Jim Ogul and Anita Grinvalds regarding exhibit content, Jan Clements on matters of artifacts and history, Terry Chambers and Dave Ryder on the overall theme and treatment of the areas, and Mr. McCarty on the contract changes. Mr. Haroutunian testified that, as the exhibitry was designed, proposals for changes were made and accepted by the government, and that most of the changes were "documented in writing because they had to be signed-off on." However, curiously, no such documentation was ever introduced into evidence.

D & P produced and delivered only one of the five video disc masters it had planned to complete (as stated in the cost proposal). However, D & P did deliver all of the programming it had promised. RCA had "shut down" their disc mastering facility before D & P had finished its work, therefore, as testified to by Mr. Haroutunian, some of the work could not be transferred to video disc. As a result, D & P delivered on a video tape some of the information that it had planned to deliver on video disc. D & P provided programming material on other media, i.e. floppy discs. Furthermore, according to Mr. Haroutunian, one video disc running on RCA equipment "was the equivalent of" multiple video discs on the Sony system. In Mr. Haroutunian's opinion, D & P delivered "considerably more" than it had originally proposed. In terms of content material, this assertion has never been disputed by the defendant.

Commerce had asked D & P to come up with an alternative to the video debate system in Area Four. The video debate system had proven to be unsuccessful when used in Knoxville pavilion. Therefore, instead of the debate system, D & P provided six independent interactive video games, including an electronic voice synthesizer. Instead of the two "video towers" in Area Five, D & P delivered six interactive history video systems. Instead of the water management theater with two projection televisions and a polling system in another part of Area Five, D & P delivered four interactive computer/video quiz systems. Instead of the sixteen interactive displays and four large projection televisions in the Water Arcade for Area Six, D & P delivered two interactive computer/video systems and a multiple monitor video playback

system. Although D & P had anticipated using two hard disc drive systems with the computers, the way it configured the computers made the systems unnecessary.

As a result of the donation of equipment from RCA, D & P delivered 20 video disc players, one video tape player, 63 15–inch and 25–inch television monitors, not including extras supplied in the event of a malfunction with an installed display monitor, instead of the original proposal of 21 video disc players, six video projectors, and 23 television monitors (not including spares). Mr. Haroutunian testified that because the video projectors did not fit in the exhibitry the way D & P had originally envisioned, the proposed projectors were replaced by large-screen televisions. In addition to the donated equipment from RCA, D & P provided 26 Apple computer systems, 16 touch sensitive displays, and six voice synthesizers, instead of the proposed 21 computer systems and 21 touch sensitive displays.

Although the donation of the RCA equipment saved D & P a large sum of money (approximately $190,000), D & P incurred substantial costs in the adaptation and preparations necessary to use the RCA equipment, as well as additional costs associated with added exhibitry supplied in other areas of the pavilion. According to Mr. Haroutunian, any net savings from the changes were allocated to other elements in the exhibitry.

Regarding D & P's Phase II deliverables, Mr. Ogul wrote an internal memorandum to Mr. McCarty on January 19, 1984, noting that some of the drawings contained inconsistencies, and that D & P had failed to supply equipment lists as required by the contract. These problems were communicated to Mr. Scully of D & P in a January 24, 1984 letter, bearing Mr. Andris Karlsons' signature. Accepting those Phase II deliverables as revised Phase I documents, Mr. Karlsons directed D & P to submit all Phase II requirements by February 1, 1984. According to Mr. Ogul, the equipment lists were delivered to Commerce

about two-thirds of the way through the fair.

In a letter dated January 31, 1984, Mr. Smith, D & P's contract administrator, responded to Mr. Karlsons' January 24, 1984 letter. According to Mr. Smith,

Substantially all of [Mr. Karlsons'] comments concerned the absence of construction details from [D & P] design drawings, which, as explained at the January 25th meeting between ... technical representatives [of D & P and Commerce], is effectively a request for submission of shop drawings under Phase II. Paragraph I.B.4.C of the contract specification clearly describes the preparation and submission of shop drawings as a Phase III requirement.

Under a cover letter also dated January 31, 1984, sent by Federal Express, D & P delivered the Phase II theater design drawings.

At the end of the summer of 1984, toward the end of the Fair, Mr. Karlsons asked Mr. Ogul to prepare a list of things in the contract which had not been delivered. Ms. Grinvalds and others assisted Mr. Ogul. Mr. Karlsons stated that he had no personal knowledge of the exhibit deficiencies. Mr. Ogul admitted that the items described on the list as "required by the contract" came from D & P's cost proposal.

When instructed by Mr. Karlsons to prepare this list, Mr. Ogul was not asked to look for items which D & P delivered in excess of those supposedly called for in the contract.[5] The list prepared by Mr. Ogul was incorporated into the contracting officer's February 1, 1985 final decision on D & P's claim for compensation for constructing the theaters.

Mr. Karlsons asserted that D & P was contractually bound to deliver five video disc masters, a custom interface system for the polling stations, two hard disc drive systems, custom electronics for the debate area, 24 Sony video disc players, 26 Sony monitors, 25 Elographics touch sensitive screens, and seven Sony video projectors.

---

**5.** During the trial, Mr. Ogul testified that he was confident he could have gone over the pavilion

and found examples of such extras.

Of this equipment, Mr. Karlsons decided that D & P had only delivered one video disc master and eight touch sensitive screens.

### 2. Areas Three and Eight

In the section of the solicitation on "Thematic Considerations" for the pavilion, the government suggested that there be an introductory area followed by a reception area. The reception area, later known as "Area Three" in the technical proposal, received particular attention in the solicitation's Scope of Work:

> The Introductory Area is followed by a Reception Area, where visitors are greeted by the President's message of welcome and which houses an information counter. A directory orients the visitor to both the thematic and the spatial organization of the building. Also included in this area is a display recognizing the contributions made to the Pavilion by various donors. An orientation to the special 3–D movie is also presented.

In its technical proposal, D & P presented its ideas for the various exhibition areas. Under the heading "Exhibit Scenario" for Area Three, D & P proposed the following:

> Stepping off the [entry] walkway, visitors circulate in approximately 1600 sq. ft. of Reception Area lobby, staffed by Pavilion personnel and supported by graphics describing the content of the Pavilion, conveying the welcoming message from the President and providing Donor information. Those who need special services, access to restrooms or other facilities would be addressed at this point. A count-down clock for the theater indicating waiting times and the subject of the film would be provided as well.

For the work in Area Three, D & P estimated in its cost proposal that it would require 2,000 hours of labor ($37,995), some wood and finishing material ($11,505), and planning and consultation by Barry Howard & Associates, a subcontractor ($12,750), for a total of $62,250. In Area Eight, on Water Culture, D & P estimated 9,000 hours of labor for fabrication and installation ($167,850), material ($157,000), and subcontracted work by Barry Howard & Associated ($170,194) and for general construction ($3,500), for a total of $498,544.

At a meeting on November 28, 1983, at the office of Barry Howard & Associates, the design subcontractor, Barry Howard presented a proposal to Commerce for Area Eight in excess of budget. Instead, Mr. Chambers suggested that the area be scaled back. Originally there was to be a rest area between Area Eight and the queuing for the theaters. The rest area became an exhibit for the Small Business Administration. As a result of this change, at Mr. Chambers' request, Area Eight was changed to allow people to rest before queuing for the theaters. Mr. Haroutunian testified that Area Eight was changed from a busy exhibit to more of an art gallery. According to Mr. Ogul, Mr. Chambers decided to put a gift shop in the middle of Area Eight. The gift shop was completed by another contractor.

Mr. Chambers also ordered the changes that were made in Area Three. The reception desk, originally planned for this area, was deleted because Commerce did not believe that it had the personnel to operate the desk correctly and that the desk might inhibit visitor flow.

Mr. Ogul testified that, during the exhibition, Mr. Chambers berated Mr. Ogul several times because Area Eight was "skimpy," and that Mr. Chambers personally brought some items from the Coast Guard warehouse in the area to augment the decor. Nonetheless, the day after the pavilion opened, Mr. Ogul signed certificates of inspection on behalf of the government for Areas Three and Eight, noting a few minor problems: a picture needed to be angled slightly, a barrier system was needed at the base of a fire escape, a print needed straightening, and an audio tape needed editing.

In his final decision on D & P's claim, Mr. Karlsons, as the contracting officer, declared that D & P was obligated to have spent $468,000 on the work in Area Eight and $62,250 in Area Three, dollar amounts which came from the cost proposal. Mr. Karlsons asserts that D & P only spent

about $150,000 on Area Eight and $25,000 on Area Three. According to Mr. Ogul, Commerce hired an independent exhibits professional to estimate the cost to fabricate the exhibitry in those areas, but he was not asked to evaluate any other exhibit areas. It was that unnamed expert who came up with the amounts that Karlsons says D & P spent on the exhibitry.

### 3. Administrative Area

The contract, awarded to D & P on June 7, 1983, specified that the following paragraph be added to the solicitation's section on Scope of Work:

> K. Contractor Responsibilities—Administrative Area. Contractor shall provide thematic consideration and design services for color selection and coordination for carpeting and wall finishes and shall provide painting or finishing of wall surfaces.

In its June 3, 1983 letter to D & P, Commerce noted that D & P had not provided a plan for final finishing of the Administrative Area in either the technical or cost proposal. In the revision of the technical proposal, submitted on June 4, 1983, and incorporated into the contract, plaintiff stated: "In the administrative areas, we intend to paint the LWE provided finished drywall surfaces." In the revision of the cost proposal, submitted on June 6, 1983, plaintiff stated that provision had already been made for painting the drywall in and design coordination of the administrative area.

Commerce alleges and plaintiff does not contest that D & P failed to paint the walls in the administration area. No evidence was presented to the court to show whether notice of deficiency regarding D & P's failure to paint the walls in the administration area was given to D & P during performance of or at the completion of the contract. In his final decision, Mr. Karlsons found that D & P failed to fulfill its obligation to paint the administrative area walls, which, he asserts, would have cost $18,000 in labor and materials.[6]

6. At trial, Mr. Ogul testified that someone by the name of Dick Dickson provided the estimate of $18,000. No information was offered to the

## II. DISCUSSION

### A. PLAINTIFF'S CLAIM

Plaintiff filed its original complaint on October 26, 1984 and filed an amended complaint on May 16, 1986. In its answer to plaintiff's amended complaint, defendant raises three affirmative defenses: statute of limitations, waiver by plaintiff of its right to relief and equitable estoppel. Defendant also reiterated a counterclaim, first raised in defendant's first amended answer to plaintiff's original complaint.

■ Paragraph thirteen of plaintiff's original complaint claimed that defendant's demand that plaintiff build the theater walls constitutes a constructive change in the contract for which plaintiff is entitled to relief for the full amount of the subcontract to Jones, as well as overhead expenses. Plaintiff subsequently sought to file an amended complaint, adding additional claims, which was objected to by the government on the basis that the amendment would circumvent the twelve month statute of limitations. In an Order dated May 16, 1986, Judge Miller, to whom this case was originally assigned, granted plaintiff's Motion for Leave to Amend. *Design & Production, Inc. v. United States*, 10 Cl.Ct. 80 (1986). In that Order, Judge Miller effectively disposed of defendant's statute of limitations defense when he allowed amendment of the complaint and indicated that in plaintiff's situation the claims in question comprise a single claim, as that term is used the Contract Disputes Act, when denial of the claim was timely appealed. 10 Cl.Ct. at 81 (citing to RUSCC 15(c), 3 Moore's Federal Practice ¶ 15.15[3]; Wright & Miller Federal Practice and Procedures: Civil §§ 1496–97: *United States v. Posner*, 405 F.Supp. 934, 937 (D.Md. 1975)). Moreover, Judge Miller pointed out that plaintiff was electing only to specify that the present action includes all the elements of the certified claim denied by the contracting officer. *Id.*

court regarding Mr. Dickson's identity or establishing his expertise to estimate the cost of painting walls.

■ This court is now bound by Judge Miller's decision by the law of the case doctrine. Indeed the Court of Claims has prescribed that: "the general rule is that a decision by the court on a point in a case becomes the law of the case unless or until it is reversed or modified by a higher court". *Raylaine Worsteds, Inc. v. United States*, 146 F.Supp. 723, 726, 137 Ct.Cl. 54, 58 (1956). Moreover, this court notes that none of the exceptions to the law of the case doctrine recognized by the United States Court of Appeals for the Federal Circuit apply in the instant case. *Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*, 761 F.2d 649 (Fed.Cir.1985).

■ As discussed below, of the defenses raised by the defendant, none act to bar plaintiff's claim. Defendant's affirmative defenses, based on the doctrines of waiver and estoppel raised in its answer to plaintiff's original and amended complaints, are interchangeably discussed by the defendant and never clearly stated or supported. Defendant has failed to clearly articulate a valid basis for reliance on the estoppel defense, and the facts in this case do not support defendant's reliance on the doctrine of estoppel. In defendant's response to plaintiff's pre-trial submission, defendant argues that the doctrine of waiver applies because plaintiff knew of defendant's interpretation of the contract concerning responsibility for constructing the theater walls well in advance of notifying the defendant it disagreed with defendant's position. The government argues that plaintiff became aware of a difference of interpretation regarding the requirement to construct theater walls no later than July 19, 1983, but did not dispute the possible ambiguity until December 1983. Defendant contends that plaintiff's failure to timely inform the defendant of the dispute in order to allow the government an opportunity to attempt to mitigate possible damages waived its right to claim that defendant's interpretation constituted a constructive change to the contract.

As detailed more fully below in the discussion on plaintiff's claim, although the defendant maintains that the contract was clear in its requirement that D & P was responsible for building the interior walls, the plaintiff is equally convinced that the contract, and documents submitted by Design and Production to the government, make it clear that the plaintiff did not have a responsibility for wall construction. Based on the evidence, the court finds that plaintiff maintained a consistent position throughout contract negotiation, contract documentation and during the dispute once it clearly arose in December of 1983 (the date stipulated to by the parties as the date the dispute arose). Additionally, the court finds that defendant's position varied as to who was responsible to construct the walls at issue at different times during contract performance between Louisiana World Exposition and then the plaintiff. In fact, it would appear from the record that the government was scrambling to ensure that such construction occurred in time for the pavilion to open on schedule. Moreover, the contract documents do not contain language requiring D & P to be responsible for building those walls.

Although it is possible that "[d]elay in asserting rights prejudice the government by running up recoverable cost," *Rixon Electronics, Inc. v. United States*, 536 F.2d 1345, 1352, 210 Ct.Cl. 309, 322 (1976) (citing *Ling–Temco–Vought Inc. v. United States*, 475 F.2d 630, 201 Ct.Cl. 135 (1973)), the defendant's argument, premised upon the doctrine of waiver is inapplicable. The cases cited by the defendant with respect to the waiver principle are easily distinguishable from the instant case. First, in *Dynalectron Corp. v. United States*, 518 F.2d 594, 207 Ct.Cl. 349 (1975), the Court of Claims held that where the contract specifications were defective (not the case here), which made production of a satisfactory product impossible, the contractor waived its right to sue under the contract by failing to notify the defendant of the defective specifications in a timely manner. Second, in *E. Walters & Co. v. United States*, 576 F.2d 362, 217 Ct.Cl. 254 (1978), the Court of Claims held that the contractor waived it rights to sue under the contract by failing to assert the claim concerning the defendant's improper exercise of an option under

the contract until 2 years after the letter of award and approximately 6 months after final delivery under the contract (not close to the situation herein). Moreover, the doctrine of waiver is premised upon prejudice to the government by the running up of recoverable costs due to the contractor's failure to notify the government of the contested issue. The instant case is clearly distinguishable and the doctrine of waiver does not apply.

In the instant case, the contractor, D & P, notified Commerce of its disagreement as to the contract scope in November 1983. The defendant's contention that the July 1983 meeting notified Design and Production of their responsibility and D & P's failure to take issue immediately is explainable, and cannot be ruled a waiver. Mr. Haroutunian's testimony that he believed the reference to the walls in Mr. Ogul's notes of the July meeting refer to the half-height walls discussed at the meeting as a replacement for the theater ropes and stantions in the queuing area is quite convincing, since it was not until December, 1983, that D & P and the defendant, by stipulation, agree the dispute over the theater walls arose. If the July, 1983, meeting were to be considered the first notification to the plaintiff, D & P, regarding responsibility for the construction of the theater walls, clearly, D & P would have asserted its position earlier in the contract performance period, given the cost of constructing theater walls, and the defendant would not have acquiesced to the stipulation that the dispute concerning the construction responsibility arose in December 1983. Moreover, the government was not entitled to any notice since plaintiff's position that it did not have a responsibility to construct the walls was made clear by the plaintiff at the onset of and reiterated consistently throughout its negotiations with the government. Mr. Ogul maintained that, at a meeting on July 19, 1983, he informed plaintiff of the government's position, that D & P was responsible to build the walls. Mr. Ogul was the least credible of defendant's witnesses, but even assuming that he did notify the plaintiff, the government should have immediately real-

ized that there was a dispute, once it crystallized its own position, given the position which plaintiff had consistently taken, orally and in writing, that the contract entered into by them did not require wall construction.

During the trial in this case, the court allowed the parties to present a vast array of facts and circumstances to determine if the intent of the parties to the contract at issue finally and completely integrated their prior and/or contemporaneous oral agreements of the contract terms into the writing.

■ The parol evidence rule is based upon the assumption that the parties who manifest their agreement in a document which has integrated all the terms and conditions of the contract desire this document to be the final word on the meaning of their intent. The rule operates generally to disallow oral or written evidence of prior negotiations, which add to or contradict the terms of the written agreement. The most reliable clue to the parties' intentions, in a deliberately prepared and negotiated contract, should be the language of the contract itself. *See generally* E. Farnsworth, *Contracts* 447–67 (1982) (discussing the Parol Evidence Rule). Corbin defines the parol evidence rule as:

> When two parties have made a contract and have expressed it in writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing.

3 A. Corbin, *Corbin on Contracts* § 573 (1960). Williston defines the rules as: "Briefly stated, this rule requires, in the absence of fraud, duress, mutual mistake or something of the kind, the exclusion of extrinsic evidence, oral or written, when the parties have reduced their agreement to an integrated writing." 4 S. Williston, *Williston on Contracts* § 631 (3d ed. 1961). Even more recently, the Restatement (Second) of Contract states that the Parol Evidence Rule provides that a " 'binding integrated agreement discharges prior

agreements to the extent that it is inconsistent with them' and precludes the admission of prior or contemporaneous evidence to vary the terms of a final written agreement." *Montefiore Hosp. Ass'n v. United States*, 5 Cl.Ct. 471, 474 (1984) (quoting Restatement (Second) of Contracts § 213 (1979)).

■ Before the parol evidence rule can be utilized, the party asserting it must: (1) establish that the writing was a final agreement, and that the parties intended it to be the final evidence of their agreement (Parol evidence would be admissible to show that the agreement was not final.) and (2) establish that the final writing was a complete integration of the agreement. If the writing was not final, then prior or contemporaneous oral or written agreements or negotiations are admissible provided they do not contradict a term of the existing writing. Integration, as a bar to the admission of parol evidence, can be established only by a determinations of the intention of the parties, as explicit from the writing itself, the context of its execution, and any evidence of the negotiations which led to the agreement. *David Nassif Assocs. v. United States*, 557 F.2d 249, 256, 214 Ct.Cl. 407, 420 (1977). "Parol or extrinsic evidence must be admissible on the issue of the extent to which a written agreement is integrated, for, as has been said, the writing cannot prove its own integration." *Sylvania Elec. Prods., Inc. v. United States*, 458 F.2d 994, 1006, 198 Ct.Cl. 106, 128 (1972) (citation omitted); *see also* Restatement (Second) of Contracts § 214(c) and § 212 comment b (1979). Since this determination requires an analysis of the parties intent, the issue is a factual one to be decided by the trier of facts.

If the agreement is final but not complete, then additional prior noncontradictory parol terms may be integrated into the writing to reveal the intent of the entire contract. However, if the writing was both final and complete, then the writing is an integrated agreement and the parol evidence rule will not permit a disgruntled party to add to, contradict, or supplement

the writing. If it is reasonable to conclude that the parties have therein expressed their final intentions in regard to the matters within the scope of the writing, then it will be deemed a complete and unalterable exposition of such intention. If, on the other hand, the writing shows its informality on its face, then there will be no presumption that it is complete. If the disputed element of the contract is neither covered in the contract nor implied by law from the facts, then the writing did not intend to cover the point, and as to that point the writing is unintegrated (not a final expression on that point) and parol evidence is admissible. E. Farnsworth, *Contracts* 447–67. If an agreement is only partially integrated, it must then be determined whether the evidence of prior negotiations sought to be introduced would contradict one or more of the terms of the writing or whether it would merely explain or supplement the writing. In the latter case it is admissible, but in the former it is not.

■ There are two schools of thought in determining whether a writing was fully integrated (complete). First, Williston adopts a form approach by limiting the court to a review of the face of the contract to determine if the writing was intended to be a final memorial of the agreement, i.e., the court should exclude other relevant evidence of intent. Second, Corbin takes a broader approach, also adopted by Restatement (Second) of Contracts, sections 236 and 240, which allows a court to look at the writing, as well as the facts and circumstances (extrinsic evidence), to determine if the intent of parties was to finally and completely integrate the agreement into the writing. This court has adopted the latter approach, and allowed presentation at trial of all testimony or extrinsic evidence to determine the completeness of the contract in issue. The court concludes that, based upon the extrinsic evidence, the contract between Commerce and D & P was a partially integrated contract. As to all elements of the plaintiff's claim and the defendant's counterclaim, with the exception of the counterclaim regarding the electronic equipment, the court has determined

the contract to be the final expression of the parties' intentions. As to the counterclaim for allegedly unfurnished electronic equipment, the contract was partially integrated. Therefore, as to that portion of the contract which the court has concluded to be integrated, any evidence introduced at trial would be used by the court only to explain an ambiguity, if such a problem exists, provided, the contemporaneous evidence does not add to, contradict, or supplement the final expression. *Sylvania Elec. Prods., Inc. v. United States*, 458 F.2d at 1005, 198 Ct.Cl. at 126. As to the partially integrated portion of the contract, the evidence introduced at trial is used by the court to supplement the parties intentions regarding the electronic equipment the plaintiff was to supply, however, such additional evidence cannot be used if it contradicts the integrated portion of the contract.

The discussion which follows addresses the elements of plaintiff's claims and then discusses defendant's counterclaims. The court finds that plaintiff's claim for an equitable adjustment of the contract should be GRANTED in part and DENIED in part. The court also DENIES defendant's counterclaim.

### 1. Theater Walls

■ Plaintiff argues that construction of the walls separating the theaters from the queuing and exit areas was outside the scope of its contract with defendant, and therefore, that defendant's direction that D & P construct the theater walls constitutes a constructive change, for which plaintiff is entitled to an equitable adjustment. Defendant's response is that construction of the theater walls was a part, and covered by, the firm, fixed price contract between the parties.

Upon consideration of the words of the contract as a whole, the court finds that the contract between plaintiff and defendant unambiguously does not require that plaintiff construct the interior walls of the theaters. This finding also is consistent with the relevant circumstances of the contract negotiation and performance.

■ A plaintiff is entitled to an equitable adjustment when required to perform work not called for in the contract, when performance generated additional expense, by a defendant who has mistakenly interpreted the contract to require that work. *See United States v. Turner Constr. Co.*, 819 F.2d 283, 286 (Fed.Cir.1987). In resolving a dispute of interpretation, the primary purpose of the court is to ascertain the intent of the parties. *Alvin, Ltd. v. United States Postal Service*, 816 F.2d 1562, 1565 (Fed.Cir.1987); (citations omitted); *SCM Corp. v. United States*, 675 F.2d 280, 283, 230 Ct.Cl. 199, 203 (1982) (both cases cite *Dynamics Corp. v. United States*, 389 F.2d 424, 429, 182 Ct.Cl. 62, 72 (1968)). The intent of the parties is given great weight in interpreting the contract. *Alvin, Ltd.*, 816 F.2d at 1565, (*quoting with approval* Restatement (Second) of Contracts § 202(1)(1979)). "The parties' intent must be gathered from the instrument as a whole, 'from the perspective of' a reasonably intelligent person acquainted with the contemporary circumstances.'" *Id.* (citations omitted).

Plaintiff argues that the contract contains no provision requiring plaintiff to build the theater walls. Furthermore, the standard "Changes" clause, incorporated into the contract, entitles plaintiff to an equitable adjustment for cost-increasing contract changes made by the contracting officer. In his letter dated February 3, 1984, the contracting officer directed plaintiff, in writing, to carry out the Cooper Lecky plan, which included building the walls. Therefore, plaintiff concludes that it is entitled to an equitable adjustment for the costs it incurred in doing the claimed extra work. Defendant contends, however, that the contract does require plaintiff to build the theater walls within the contract's firm fixed price. Therefore, the contracting officer's direction to plaintiff to build the walls is not a change in the contract, and the compensation for the construction was included in the original contract price.

Defendant cites two inapposite cases as support for its argument: *Utility Contractors, Inc. v. United States*, 8 Cl.Ct. 42, 48 (1985), *aff'd* 790 F.2d 90 (Fed.Cir.), *cert. denied*, 479 U.S. 827, 107 S.Ct. 104, 93

L.Ed.2d 53 (1986), and *McNamara Const. of Manitoba, Ltd. v. United States*, 509 F.2d 1166, 1169, 206 Ct.Cl. 1, (1975). In these cases, the contractor-plaintiffs had higher than expected expenses, which resulted from allegedly unexpected phenomena outside their control (viz., flooding and a labor strike). They sought compensation, in addition to that provided in their contracts, because of these unanticipated expenses. However, the courts in these cases found that the contracts placed the risk of these increased expenses on the plaintiffs. The present case does not concern such phenomena nor the allocation of risk following its occurrence. In the cases cited to by defendant, the courts held that the plaintiffs were not entitled to additional compensation for unforeseen difficulties in performing the contracted for tasks. The present plaintiff, however, does not seek compensation for unforeseen difficulties outside its control.

The contracting officer and other government officials testified at the trial. Although they acknowledged that the contract does not expressly state that plaintiff was responsible for constructing the walls, they opined that it was implicit in the contract. In its post-trial brief, defendant went beyond this testimony, declaring that, "[t]he solicitation, which was incorporated into the contract, unequivocally states that plaintiff was required to 'provide final design, fabrication, and installation' of its project proposal." Because provision of the theater design (which included the design for the walls) was part of plaintiff's proposal, defendant argues that the contract required plaintiff to fabricate the walls of the theater.

Defendant's description of the "unequivocal" requirements of the contract glaringly misrepresents the quoted sentence. The phrase of the contract, from which defendant misleadingly quotes (paragraph on the Scope of Work in the main part of the solicitation), states that the contractor is "to provide final design, fabrication, installation and maintenance of exhibitry in the U.S. Pavilion in accordance with the Statement of Work." Although the design of the walls is a part of the project proposal,

the "exhibitry," as described in the "Statement of Work," does not include construction of the theater walls.

The "Statement of Work," an attachment to the solicitation, begins with a general statement:

> The contractor shall develop the final design (drawings and specifications) and acquire and/or fabricate and install all exhibits and thematic components deemed necessary to enhance the United States Pavilion (building to be provided by Louisiana World Exposition LWE).

The "Statement of Work" then describes the contract's scope of work in two categories: "Artifacts, Displays, and Graphics" and "Thematic Support and Finishes." Only the second category mentions the theaters. It states that the contractor is to provide, "theater specialties, including seating and acoustic treatment." Although the phrase "theater specialties" suggests that the walls of the theater are not included therein, the contractor's obligation in this regard is made unambiguous by another part of the contract, the technical proposal.

Making clear what is meant by "theater specialties," plaintiff's technical proposal sets forth the extent of plaintiff's work in the theaters: "[Provide] design services, as required; provide and install 1,500 American Seating Stellar Series Theater Seats; provide and install acoustical treatments (i.e., acoustical tiles) as required on theater walls; finish projection booth walls, provide and install glass." This statement of the location of the installation of the acoustical tiles, however, is the only reference in the technical proposal to the theater walls. It is indicated elsewhere in the contract that plaintiff would provide the theater design as a part of the contract. No mention is made of a theater construction requirement.

Other parts of the technical proposal, such as the performance charts, the project management chart (listing "theater design" but no related or general construction), and the listing of the subcontractors' responsibilities, also fail to mention the walls. If indeed, by mutual interpretation of the con-

tractual requirements, plaintiff was obligated to construct the walls at issue, one would expect some mention of the plaintiff's obligation in these portions of the technical proposal of the plaintiff's construction obligation. All witnesses questioned on this subject, including the contracting officer and his assistants, acknowledged that the contract does not mention the construction of the theater walls. In fact, Mr. McCarty, the contract specialist, testified that he knew from reviewing the technical proposal that plaintiff had not identified theater walls as one of the items to be provided.

The absence of any other reference to the walls in the contract documents, especially one indicating that plaintiff is required to build them, is an unambiguous indication that the parties did not intend this contract to require plaintiff to build the walls.

It is an established rule of contract interpretation that where several subjects of a class or group are enumerated and there are no general words to show that other subjects or items are included, it may reasonably be inferred that the subjects or items not named were intended to be excluded.

*Monroe M. Tapper & Assoc. v. United States*, 602 F.2d 311, 314, 221 Ct.Cl. 27, 33 (1979), (citing with approval 3 A. Corbin, *Corbin on Contracts*, § 552 (1960). Indeed, as the maxim states: *expressio unius est exclusio alterius, J.W. Bateson Co. v. United States*, 450 F.2d 896, 902, 196 Ct.Cl. 531, 542 (1971), the "expression of one thing is the exclusion of another." E. Farnsworth, *Contracts* § 7.11 (1982).

The parties enumerated those tasks which plaintiff contracted to perform. There are no general words to show that other tasks not mentioned are included. Thus, the only reasonable interpretation of the contract is that the contract does not require plaintiff to construct the walls. "When a provision permits only one reasonable interpretation, that interpretation must be followed." *SCM Corp. v. United States*, 675 F.2d at 283, 230 Ct.Cl. at 204; *see also Dana Corp. v. United States*, 470

F.2d 1032, 1043, 200 Ct.Cl. 200, 216 (1972). Because the meaning of the contract's requirement concerning the construction of the walls is certain, the contract is unambiguous. *See Chris Berg, Inc. v. United States*, 455 F.2d 1037, 1045–46, 197 Ct.Cl. 503, 517 (1972), (quoting *Southern Constr. Co. v. United States*, 364 F.2d 439, 452–53, 176 Ct.Cl. 1339, 1361 (1966)). ("Contracts are not necessarily rendered ambiguous by the mere fact that the parties disagree as to their meaning. There must be a reasonable degree of uncertainty of meaning.") In any event, if the contract at issue were to be found ambiguous with respect to the theater construction requirements, it is also true that, a government contractor need only carry the burden of interpreting a contract reasonably; Accordingly as the drafter of a contract, defendant has the responsibility of seeing that, within the zone of reason, the words used convey their intended meaning. *Salem Eng'g & Const. Corp. v. United States*, 2 Cl.Ct. 803, 807 (1983).

The theater walls are recognized in the contract as a part of the environment to be provided by others, within which plaintiff would do its work. Therefore, the court finds that the contracting officer's direction to build the walls was a constructive change in the contract for which plaintiff is entitled to an equitable adjustment.

The conduct of the parties in interpretation and performance of the contract, before the dispute arose, is also significant in determining the parties' intent. *Alvin, Ltd.*, 816 F.2d at 1566; *Macke Co. v. United States*, 467 F.2d 1323, 1325, 199 Ct.Cl. 552, 556 (1972). *Contra, SCM Corp. v. United States*, 675 F.2d at 284, 230 Ct.Cl. at 206; *Butz Eng. Corp. v. United States*, 499 F.2d 619, 628–29, 204 Ct.Cl. 561, 578–79 (1974) (When a contract is clear and unambiguous, the parol evidence rule bars consideration of evidence outside the contract. However, the court in *SCM Corp.* stated that it reviewed the parol evidence because the parties had spent much time discussing it. *SCM Corp.*, 675 F.2d at 284, 230 Ct.Cl. at 206). In the present case, the conduct of the parties corroborates the finding that

plaintiff is not required to build the theater walls.

When plaintiff first bid on the contract, in the fall of 1982, the contractor was not required to build the theater walls. At that time, it was planned that Louisiana World Exposition, the fair organizer, would provide the theater walls as a part of the building it was constructing for the government.

Although some of defendant's witnesses seemed at times to deny knowledge of whether the design for the theater called for interior walls, the preponderance of evidence presented at trial indicates that both parties knew (or should have known), at all times relevant hereto, that the design called for interior walls for the theater to be provided. Defendant argues that it had no reason to know whether such additional walls would be required. They argued that the need for additional walls would depend on the theater design provided by plaintiff, and therefore, plaintiff was and should be held responsible for any construction called for in the plans it submitted. The defendant, however, prior to award of the contract for the plaintiff, had the Cooper Lecky Design, which showed the interior walls, and which design was in the defendant's possession. The evidence, therefore, does not support defendant's contentions that it did not know whether additional walls would be required.

At the time she authorized plaintiff to submit a proposal as a potential sole source contractor for the project, the first contracting officer, Joyce Cavallini, sent plaintiff a letter stating that plaintiff would be "responsible for the design and fabrication of the interior of the theaters and the design, development of specifications, purchasing, and installation of all items inside the theaters (seats, walls, acoustics [sic], etc.)." Plaintiff's sole source proposal, submitted later that month, included provision for the theater design and acoustical wall treatment in the theater, but did not cover construction of the interior walls of the theater called for in the theater design. Mr. Zuidema, president of D & P, testified at trial that one of the differences between the original solicitation and Commerce's requirements during the sole source phase was that D & P would be required to provide a design for the theaters. Mr. Zuidema further testified that D & P informed Commerce that theater design was not in its line of work. Indeed, this was the first time D & P had been involved in theater design. Mr. Ogul testified that, in the spring of 1983, when the Designgroup contract was terminated, Commerce considered having Guggenheim, the film producer, be responsible for constructing the theaters, but decided to "leave it in the solicitation" for D & P to do. Throughout the trial, however, the court found Mr. Ogul's testimony the least credible of all the witnesses who appeared. Moreover, in the last analysis, regardless of Mr. Ogul's testimony, the contract, as signed, includes no such requirement.

In early April 1983, the contracting officer sent a letter to plaintiff stating that "[a]s a result of [the] review [of the proposal] the Government has identified several areas of concern that need to be addressed by your firm." Construction of the theater walls was not one of the areas mentioned. The next day, in its letter responding to those areas of concern, plaintiff stated that its proposal was conditioned on various assumptions, among which was, "[t]heatre walls, finished dry wall, to be supplied by Government." The government's contract specialist and the contracting officer's technical representative both acknowledged at trial that they were aware that the plaintiff's sole source proposal did not include construction of the theater walls.

Although the sole source solicitation, correspondence, and proposal did not form a part of the ultimate contract between plaintiff and defendant, the terms of the agreement contemplated therein set the context for the subsequent contractual arrangements and illuminate the presumptions with which the parties entered into the competitive stage of the negotiations and which ultimately led to the contract award. During the sole source stage, plaintiff did not intend to obligate itself to build the theater walls, and defendant knew or should have known this to be the case.

Defendant's contract specialist, Mr. McCarty, testified that he "vividly" recalled having a conversation with a representative of plaintiff in which the contract specialist told the representative that if the theater design provided by plaintiff included theater walls, then the construction of the walls would be the contractor's responsibility. This conversation allegedly took place between the time of the issuance of the competitive solicitation and the contract award.

Subsequently, Mr. McCarty, acknowledged that the drawings of the building which had gone out with the solicitation, "unfortunately" showed the theater walls, but that any question as to who was to build such walls had been clarified in the alleged conversation. Plaintiff's representative, however, testified under oath that he recalled no such conversation. The contract specialist also claims to have told the competing contractor the same message. The competing contractor's proposal, however, also did not include a plan to build the theater walls. The contract specialist explains this by assuming that the competing contractor thought it could talk LWE into building the walls.

At the time the contract specialist's deposition was taken, a year and a half before trial, Mr. McCarty did not recall his alleged conversation with plaintiff's representative, but that his memory had been "refreshed" by a document which was later excluded from evidence (on a hearsay objection), and he said he would have to refer to his notes to remember whether it was he or the contracting officer's technical representative who had talked with plaintiff's representative. The contracting officer's technical representative could recall no such conversation. No other evidence was presented to show that such a conversation had taken place.

Although not incorporated into the contract, D & P's cost proposal, submitted on May 18, 1983, was submitted into evidence at trial, and illuminates plaintiff's intent at the time it entered into the contract, and defendant's concurrent awareness of plaintiff's intent. The cost proposal's itemization for the theater area allocated $16,785 and $20,000 for labor ("fabrication and installation") and material, respectively. For subcontracted efforts in the theaters, $133,500 was allocated to American Seating for the theater seats, $106,674 to Cooper Lecky for the theater design, and $1,700 to Barry Howard and Associates for design oversight. The items to be fabricated and installed by plaintiff are not specified in the cost proposal, but the technical proposal, incorporated as part of the contract at issue, indicates that plaintiff's work in the theaters was installation of acoustical tiles and finishing of the projection booth walls and installing the glass.

The contracting officer's technical representative, Mr. Ogul, testified that he had not read the cost proposal or its cover letter before the contract award, "[o]r if [he] did, [he] just scanned it." The contract specialist, Mr. McCarty, testified that he was aware that plaintiff had included no money in the cost proposal for construction of the theater walls. He said that he just assumed the plaintiff was planning to use a theater design without extra walls. However, the specialist was aware of the theater design which called for those walls, was aware of no other design, and knew that the theater designer would not have been paid for a new theater design (e.g., one without the additional walls).

D & P's cover letter to the cost proposal stated that the price contained therein was conditioned on defendant's furnishing of "interior walls suitable for finish treatment." Mr. Haroutunian, testifying for the plaintiff, stated that the interior walls mentioned in the cost proposal referred to the walls in the exhibit and administrative areas, as well as for the theaters. The contracting officer's technical representative (who had not read the proposal until after the award of the contract) testified that he understood this condition simply to require that any walls provided by LWE not be rough.

The cost of constructing the walls at issue was so great that it would be unreasonable for defendant to think the cost was included in some area of the cost proposal

without being mentioned expressly. The contracting officer's technical representative said that if plaintiff did not want to contract to build the walls, it should have explicitly informed the government of its contractual conditions. Contrary to the defendant's contentions, the court concludes that the plaintiff properly notified the defendant in its proposal, in its cover letter, as well as by omission in the cost and technical proposals that it conditioned its performance under the contract on the preexistence of the theater walls.[7]

A meeting was held on July 19, 1983, among defendant, plaintiff, and others. The contracting officer's technical representative, Mr. Ogul, took notes of the meeting which, in pertinent part, state: "Ogul stated the DOC position that theater ceilings are under the scope of the D & P contract, as are theater lighting beyond housekeeping lights and walls inside the shell provided by LWE." A copy of the notes were sent to plaintiff for comment. Plaintiff did not take exception to this statement because Mr. Haroutunian, one of plaintiff's key officers working on the pavilion project, thought "walls" referred to half-height walls in the queuing area, which the City of New Orleans had advised subsequent to the meeting, would not be allowed for safety reasons.

At the recommendation of defendant's contract specialist, Mr. McCarty, Mr. Ogul wrote a memorandum of a telephone conversation on July 21, 1983, with Mr. Haroutunian. The memorandum says that Mr. Ogul told Mr. Haroutunian that the government's position was that plaintiff was responsible for the interior walls in the theater. According to the memorandum, allegedly authored by Mr. Ogul, Mr. Haroutunian "said he understood that to be the case." The memorandum itself does not state who wrote it. In his deposition, Mr. Ogul could not recall participating in that

conversation and said that he did not normally take notes of telephone conversations. Moreover, other memoranda by Mr. Ogul were in a different format and were initialed by Mr. Ogul. Mr. Haroutunian did not recall any such conversation with Mr. Ogul. The court is unpersuaded, given the contradictory testimony, Mr. Ogul's at times questionable creditability throughout the trial, and the unusual format of the memorandum in question, that these events demonstrate a concession on behalf of D & P that they understood that it was their responsibility to build the walls in July of 1983.

On July 26, 1983, Cooper Lecky, the architectural firm which designed the theaters, sent plaintiff the already completed drawing package. In the cover letter, Mr. Cooper stated that it was his understanding that LWE had agreed to build the theater walls at a January 1983 meeting. He also said that the ceiling, "a surface on which D & P would hang the acoustic and decor treatment," "obviously was considered to be an LWE provided element (as agreed in January), in order to make the theater mechanical system work."

The contracting officer concludes on page two of his final decision letter that the fact that plaintiff sought a construction permit, is evidence that plaintiff knew it had to build the theater walls. Mr. Haroutunian, credibly testified that plaintiff was only applying for an occupancy permit and variance, which it needed because of the way in which the theater seats were arranged (contiguously from one side of the theater to the other). Karlsons admitted that he did not know the difference between a building permit and construction permit.

In his deposition, Mr. Karlsons testified that his decision was not based on the contract documents. Rather, the contract-

---

7. The instant situation is not unlike the classic mistake in bid cases in which the law is clear that if a contracting officer is aware or reasonably should be held to have been aware of facts and circumstances which reasonably should have given rise to the presumption of error in the bid under consideration, he has a duty to verify the bid, by calling attention to the specific error suspected, whether or not that error is reasonable. *Aydin Corp. v. United States,* 669 F.2d 681, 685, 229 Ct.Cl. 309, 314 (1982) (citing *National Line Co. v. United States,* 607 F.2d 978, 221 Ct.Cl. 673 (1979); *Ruggiero v. United States,* 420 F.2d 709, 190 Ct.Cl. 327 (1970); *Chernick v. United States,* 372 F.2d 492, 178 Ct.Cl. 498 (1967)).

ing officer indicated his decision was based on conversations, at which Mr. Karlsons was not present, but which Mr. Ogul had told him had taken place subsequent to the contract award, in which D & P had acknowledged its responsibility to build the walls. At trial, the representative of D & P contended that these conversations did not take place. At trial, Mr. Karlsons also mentioned that "the various documents that have been introduced here" also influenced his decision. But, Mr. Karlsons stated that, had it not been for the conversations which Mr. Ogul alleged had taken place after the award, his decision would probably have been otherwise. The court finds this to be an important concession from a credible witness, and as has been discussed throughout this opinion, the court is reluctant, given Mr. Ogul's demeanor at the trial and at times apparent contradictory and vague recollections, to base a decision on Mr. Ogul's assessments.

At the request of defendant, plaintiff participated in the preparation of a list of "Suggested Responsibilities to Be Transferred to LWE" for the use by the defendant in its negotiations with LWE for the pavilion lease, which was entered into finally on November 3, 1983. One of the responsibilities listed is "LWE to provide walls inside theater for DOC contractor to finish." Defendant suggests that this shows that the plaintiff knew that provision of the walls was its responsibility, and that it wanted to transfer that responsibility to LWE. Some of the other items on the list, however, were not plaintiff's responsibility, therefore, the inclusion on the list of having LWE provide the walls does not necessarily indicate that the construction of the walls was recognized at the time as plaintiff's responsibility.

At a meeting on November 28, 1983, plaintiff was informed that neither defendant nor LWE was going to build the theater walls. On December 15, 1983, plaintiff wrote a letter to defendant stating that the cost of the theater interior work would exceed the budget in the revised technical and revised cost proposal submitted June 4, 1983 by $250,000 to 300,000 for "theater interior construction required due to failure of LWE to furnish adequate structure as indicated by attachment to contract RFP." The government's response was that the contract required plaintiff to construct everything it designed, which included the construction of the theater walls.

The court finds that the contract and the other evidence presented at trial do not persuade it to read into the contract a requirement, which the contract unambiguously does not contain, namely that the plaintiff was required and knew, or should have known that it was required, to build the theater walls. Consequently, under the terms of its contract with the government, the plaintiff was not obligated to build the theater walls. Plaintiff, therefore, is entitled to an equitable adjustment of $358,200 for the dry wall work which it performed through its subcontractor Jones.

### 2. Electrical Work—Lighting

Plaintiff alleges entitlement to $189,500 for the electrical work performed by Jones under its subcontract with plaintiff. Plaintiff claims that all of the electrical work was outside the terms of the contract. Defendant argues that the work was required of plaintiff under the contract.

During the sole source period, the parties planned that LWE would "provide all electrical requirements." However, the solicitation, on which the contract was awarded, specified,

Special incandescent lighting shall be provided in the exhibit areas, the Source Theater and the main circular ramp to support the character and functions of these areas and to enhance the displays and graphics therein. Fluorescent lighting in these spaces shall be limited to general background illumination. (NOTE: We assume background lighting will be provided by LWE as part of the building.)

. . . . .

The contractor shall furnish and install all electrical equipment, devices, fixtures, lamps, wiring, mounting assemblies, interconnectors, and services required to perform all electrical work where light-

ing is indicated, within all transparency light boxes, wherever electrical work as [sic] required by the drawings and/or herein specified.

In preparing the cost proposal, dated May 18, 1983, plaintiff did not include an amount for the cost of lighting in the theater. Mr. Zuidema, plaintiff's president, testified that he thought that the plaintiff had no obligation to provide any lighting in the theater. "We certainly didn't include it in our proposal." Moreover, Mr. Zuidema thought the lighting work would be relatively insignificant, since LWE was to provide wiring conduit and junction boxes, and the fixtures were to come from the Knoxville pavilion as government-furnished equipment. Plaintiff's plan was disrupted when it discovered that the wiring installed by LWE for the fluorescent lighting system was incompatible with plaintiff's incandescent system. Thus, plaintiff was required to do more work than it had anticipated.

Under a firm, fixed price contract, the contractor bears the risk of increased cost of performance. *See e.g., Sea–Land Service, Inc. v. United States*, 553 F.2d 651, 657–58, 213 Ct.Cl. 555, 566 (1977). The court, therefore, finds that the electrical-lighting work performed by Jones was within plaintiff's contract with defendant.

3. Acoustical Work—Acoustical Spray, Carpet, Painting

As submitted to plaintiff on Jones' Application and Certificate for Payment, plaintiff paid Jones $187,600 for "acoustical spray" and $42,850 for "painting," for which plaintiff now requests an equitable adjustment. Plaintiff acknowledges that a change order deleted the carpet work which Jones was originally to perform and that, another contractor installed the carpet. Therefore, plaintiff does not seek reimbursement for this category of work. Plaintiff does request $12,700 for "acoustical ceiling." This item will be discussed below, together with a related change order.

As early as the sole source phase, defendant told plaintiff that plaintiff would be expected to provide and install the acousti-

cal treatment for the theaters. The contract between the parties also made plaintiff responsible for the acoustical work. In general, the solicitation required a certain minimum acoustical rating for the dampening of sound between the basic functional areas of the building. Regarding the theaters, the solicitation says, "Acoustical treatment, including sound baffles and other controls, shall be designed in coordination with the audio/visual design to provide both acoustical and visual support for the theater presentation." In the administrative spaces and the VIP lounge, acoustical ceilings were to be provided by LWE as part of the building.

In the technical proposal, plaintiff said it would "provide and install acoustical treatments (i.e., acoustical tiles) as required on theater walls; [and] finish projection booth walls, provide and install glass." The cost proposal identifies $36,785 for materials and plaintiff's labor for this work. Plaintiff's work in the queuing areas (as set forth in the technical proposal) was limited to design services, crowd control railing systems, and directional graphics.

In addition to plaintiff's acoustical treatments, the Cooper Lecky design for the theaters called for a rigid lay-in tile acoustical ceiling. In a cover letter dated July 26, 1983, which accompanied delivery of the drawing package prepared under the Designgroup contract, Mr. Cooper stated,

> It is our understanding that LWE would provide a surface on which D & P would hang the acoustic and decor treatment of the theater.... Please note that this ceiling seems to be required to form the return air plenum, so it obviously was considered to be an LWE provided element in order to make the theater mechanical system work.

It is not disputed that plaintiff did not have the responsibility for the mechanical system.

After the dispute arose between the parties over the construction of the theaters, the parties considered various alternative designs, with the objective of reducing the cost of construction. Mr. Chambers, the Acting Commissioner General of Section,

Office of World's Fairs and International Expositions of the Department of Commerce, rejected the alternative designs. With the knowledge of his superiors, Mr. Ogul directed plaintiff to proceed with the January 17, 1984 design, effecting whatever cost savings plaintiff could realize.

In an effort to reduce costs, the theaters were redesigned, eliminating the drop ceiling, reducing the thickness of sheetrock and applying acoustical spray to the walls and ceiling of the entire building, including the theaters and queuing areas.

Jones' acoustical work made it possible to reduce the cost of constructing the walls (one layer of dry wall was used, instead of two) and the acoustical spray replaced the ceiling in the theaters. Constructing the walls and installing the ceilings were beyond the scope of plaintiff's contract with the defendant. As plaintiff acknowledges, the acoustical spray also took the place of the acoustical tiles which plaintiff was going to provide under the contract. Furthermore, plaintiff has already been paid the full amount of its original contract, a part of which was for this acoustical work, for which plaintiff had allocated $36,785 in the cost proposal. However, before deducting this amount from its claim for recovery, plaintiff appears incorrectly to suggest that the $36,785 should be reduced by the cost of the carpet and projection booth glass (plus 12.6% for G & A markup), which it sets at $11,797. Plaintiff argues that the carpet and glass were somehow included in its projected costs for acoustical work in the theaters. The cost proposal does not list the glass in the category for acoustical work, and the cost of the carpet is also separate from the subcontract's acoustical spray work.

Thus, the court finds that part of the work in applying the acoustical spray was required of plaintiff under the contract,

and it was paid $36,785 for this work, but part was not. Therefore, the court concludes that the plaintiff is entitled to recover for the acoustical spray $187,600, less $36,785, which it has already received through defendant's payment of the original contract price for acoustical work.

Plaintiff claims $42,850 for painting done by Jones. Defendant contends that this claim must be dismissed because the contract makes plaintiff responsible for " 'painting or finishing of wall surfaces' in the Pavilion." What defendant does not say is that the words quoted from the contract come from a paragraph entitled "Administrative Area." Jones painted the wall surfaces in the queuing and exit areas, doors and door frames, and mechanical and electrical surfaces. This work was outside the contract, therefore plaintiff is entitled to equitable compensation for it.

### 4. Handrails

Conceding that the construction of the handrails in the queuing areas was required of the plaintiff under the contract, plaintiff does not include in its claim compensation paid to Jones for the performance of such services. Plaintiff receives no equitable adjustment for its work in this category.[8]

### 5. Hardware and Door Installation

Under the subcontract to implement the Cooper Lecky design for the theaters, Jones agreed to install the theater doors and finishing hardware for them at a cost of $2,560. LWE installed the doors, so it became unnecessary for Jones to perform this service. As a result, a change order was issued to delete the labor to install the doors. This change reduced Jones' bill to plaintiff by $1,280. Jones, however, nonetheless installed the hardware, for the doors. Plaintiff, therefore, paid Jones a net sum of $1,280 for this installation. Defendant opposes awarding plaintiff any

**8.** The court notes that plaintiff's offer to deduct $12,554 from the total of its subcontract claim misrepresents the amount included in the subcontract claim for the handrails. Jones' invoice, the Application and Certificate for Payment, on which plaintiff made payment to Jones, states that the cost of the handrails was $17,554. For this reason, the total amount to

which plaintiff is entitled will be calculated by adding together the individual components of plaintiff's claim, rather than following plaintiff's pattern of deducting the items for which it will not receive compensation from the amount which plaintiff presents to the court as the subcontract total.

money for this work because, D & P offered no record evidence to support the claim. According to the defendant, while plaintiff offered exhibitry evidence showing that it incurred the related cost, plaintiff failed to prove that this work was "beyond the [primary] contract's specifications." The court finds, however, that the defendant failed to rebut plaintiff's showing that this work was not required in the contract. Therefore, the court concludes that this work was not required under the original contract with the defendant, and plaintiff is entitled to an equitable adjustment for the net cost.

### 6. Insurance, Bonds, Permits

As required by the subcontract, Jones acquired, insurance, bonds, and permits. Jones billed the plaintiff for the cost of these purchases. The subcontract cost of these items was $18,068. Defendant's only argument raised against awarding these costs to plaintiff is that plaintiff allegedly failed to show that these items were beyond plaintiff's contractual obligations to defendant. In response, plaintiff argues that these expenses as submitted into evidence, and not contested at trial, were incurred and were derivative of the other subcontract costs. "Determination of the amount of an equitable adjustment is not an exact science and mathematical precision is not necessary where legal injury has clearly occurred." *Salem Eng'g & Const. Corp. v. United States*, 2 Cl.Ct. at 808 (citing *Inland Container, Inc. v. United States*, 512 F.2d 1073, 1082, 206 Ct.Cl. 478, 494 (1975)). Additionally, in the absence of any challenge to costs claimed by the plaintiff, they can be found to be reasonable. *Toombs & Co. Inc. v. United States*, 4 Cl.Ct. 535, 548 (1984). Thus, the court finds that the plaintiff is entitled to an equitable adjustment, including costs for insurance bonds and permits, billed to D & P by its subcontractor, Jones and submitted at trial.

### 7. Change Orders and Acoustical Ceiling

 After the subcontract had been awarded to Jones, and as work proceeded on the theaters, further changes were made to the Cooper Lecky design which required additional work. Plaintiff maintains that it undertook this additional work at the request of authorized government officials, and that it issued change orders to Jones to actually perform the new work. Mr. Karlsons, the contracting officer, was in Washington, D.C. during the construction of the pavilion; Messrs. Ogul, McCarty, and Chambers were the government officials with whom Mr. Wright, plaintiff's program manager at the site, spoke regarding the contract changes.

Defendant does not dispute that the change order work for which plaintiff seeks recovery is outside the scope of the contract. Defendant's defense is that the officers who directed the work were not authorized, government officials, capable of binding the government to work performed as a result of their actions. Plaintiff seeks an equitable adjustment for the cost of these changes on the theory that the officers who directed the work had authority.

The solicitation clearly indicates that only the contracting officer has the authority to make changes in the requirements of the contract.

> The Contracting Officer is the only person authorized to make or approve any changes in any of the requirements of this contract and notwithstanding any provisions contained elsewhere in this contract, the said authority remains solely in the Contracting Officer. In the event the contractor makes any changes at the direction of any person other than the Contracting Officer, the change will be considered to have been made without authority and no adjustment will be made in the contract price to cover any increase in costs incurred as a result thereof.

The "Definitions" clause of the contract (from Standard Form 32) states that the term "Contracting Officer" "includes, except as otherwise provided in this contract, the authorized representative of a contracting officer acting within the limits of his authority." The "Changes" clause of the contract entitles the contractor to an equitable adjustment for increased costs in-

curred in performing work outside the contract when directed to perform that work by the contracting officer. During the construction of the theaters and the completion of the pavilion, Mr. Karlsons was the contracting officer.

On the other hand, the solicitation, which was incorporated as part of the contract, expressly removes from the Contracting Officer's Technical Representative ("COTR"), in the instant case Mr. Ogul, the authority to effect changes in cost or price totals or in any other mutually agreed upon provision. The solicitation describes the COTR's responsibilities thus:

> [The COTR has the authority] to assure that the contractor performs the technical requirements of the contract; to perform ... inspections necessary in connection with performance of the contract; ... to issue written interpretations of technical requirements of Government drawings, designs, and specifications; to monitor the contractor's performance under the contract and [to] notify the contractor and Contracting Officer of any deficiencies observed.

However, [a]t no time may the COTR effect changes in the scope of work; changes in cost or price totals or estimates; ... [or] changes in any other mutually agreed upon term or provision of the contract.

Mr. McCarty represented the Government as a contract specialist. Mr. Chambers is referred to as "Mr. Ogul's superior" by plaintiff. Evidence introduced at trial identifies Mr. Chambers as the Acting Commissioner General of Section, Office of World's Fairs and International Expositions in the Department of Commerce. In that capacity, he represented the Government in various matters relating to the pavilion. He signed the pavilion lease contract between LWE and the government. Other government officials referred to him to make the decision for the Government regarding plaintiff's proposal to change the theater design to one which would not call for walls inside of the building shell.

Plaintiff argues that the government's officers at the site, in carrying out their responsibilities, had authority to modify the contract. Defendant responds that only the contracting officer had the authority to make a change which would increase the cost of the contract, and that none of the government officers whom plaintiff alleges directed the changes was a contracting officer.

The parties do not dispute that the work performed pursuant to these changes, except as noted, was outside the scope of plaintiff's contract with defendant. The issue here is whether the government officials who directed or approved these changes had the authority to do so. Rather than changes to the main contract entered into by the plaintiff and the defendant, the changes at issue here are changes to the contract modification resulting from the contracting officer's direction to plaintiff to build the theaters. In contrast to the relatively free hand defendant had given plaintiff in making cost-saving changes, changes increasing the cost of the work require approval of an authorized government official.

Government contracts allocate among various officials the responsibility for administering the contract and the authority to direct the work of the contractor on site. One purpose of this arrangement is "to save the Government from liability for the unjustified demands of subordinate and unauthorized personnel." *WRB Corp. v. United States*, 183 Ct.Cl. 409, 422 (1968). Contract provisions concerning equitable adjustments and officers' authority enable a contractor to perform a contract for the government with full knowledge of the contractor's rights and responsibilities regarding demands for extra work and subsequent payment for costs arising therefrom. Since an officer of the government cannot bind the government with respect to matters beyond the limits of his authority, a person dealing with an officer or agent of the government must inform himself regarding the actual authority of such an individual. *Wilbur Nat'l Bank v. United States*, 294 U.S. 120, 123–24, 55 S.Ct. 362, 363–64, 79 L.Ed. 798 (1935); *Max Drill, Inc. v. United States*, 427 F.2d 1233, 1243, 192 Ct.Cl. 608, 624 (1970).

The solicitation in the present contract allocated and described the authority of the contracting officer and the contracting officer's technical representative. The solicitation also identifies the following officers: Mr. Ogul as COTR; Mr. McCarty as contract administrator; and Ms. Cavallini as contracting officer. Ms. Cavallini was later succeeded by Mr. Karlsons. Apparently, plaintiff failed to apprise itself of these assignments. In fact, Mr. Wright, of D & P who was on site, testified at trial that he thought Mr. McCarty was the contracting officer.

The contract states unambiguously and puts the plaintiff on notice that the contracting officer's technical representative did not have the authority to change the scope of the contract or make any change that would increase the cost. Nonetheless, without inquiry of or protest to the contracting officer, plaintiff proceeded with work under the direction of Mr. Ogul, which was not called for in the contract and for which it now seeks additional compensation. Plaintiff failed to inform itself as to the authority of the government officers with whom it was dealing. The court can only countenance compensation for authorized work.

After concluding that the government officials responsible for directing the plaintiff to perform the work at issue did not have actual authority to authorize such directives, the court must consider whether the government officials, had implied authority. In two instances, plaintiff alleges that the work was directed by Mr. Chambers, who is described as the Acting Commissioner General of Section, Office of World's Fairs and International Expositions. In the other instances, plaintiff makes either a general allegation that the Government ordered the change, or that Mr. Ogul directed, or at least endorsed, the work for which compensation is being claimed, but fails to identify a specific individual.

 Although lacking actual authority, a representative of the contracting officer can be found to have implied authority to make a change in the absence of the contracting officer, if the change is within, or reasonably related and consequent to the representative's official responsibilities, such as to review or direct work under the contract. *See Wieman v. United States,* 678 F.2d 207, 214, 230 Ct.Cl. 563, 573 (1980) (Upon proper proof, where the government "acquiesced in, and accepted the benefits flowing from" actions of its official, who was not the contractually authorized individual to issue contractual change orders; such official's directives or unauthorized change orders can be regarded as constructive change orders.); *Fox Valley Eng'g Inc., v. United States,* 151 Ct.Cl. 228, 240 (1960) (each of the decisions at issue were ratified in writing by the contracting officer); *DOT Sys. Inc.,* 82-2 B.C.A. (CCH) ¶ 15,817 (1982) (Where the contract at issue did not contain a clause defining the COTR's responsibility, the Board said: "the Court of Claims and this Board have ruled that where the contract or the contracting officer licenses technical personnel to give guidance or make decisions under the specifications, the government is liable for the consequences of the action taken." (citations omitted)); *Urban Pathfinders Inc.,* 79-1 B.C.A. (CCH) ¶ 13,709 (1979). Authorization can also be found if the directive of an unauthorized official is protested to the attention of an official with the authority to make such a change. *WRB Corp. v. United States,* 183 Ct.Cl. at 421-22 (1968).

 The need for expeditious action to avoid frustration of the contract's objectives is a factor that can also contribute to a finding of implied authority. In *Urban Pathfinders Inc.,* 79-1 B.C.A. (CCH) ¶ 13,709 (1979), the Armed Services Board of Contract Appeals held that a project officer's authority to accept or reject items delivered under the contract was sufficiently broad to include the authority to change the terms of the contract "in a situation where expeditious action was required to avoid a frustration in the objectives for which the contract was awarded." *Id.* The circumstances of performance of the present contract suggest that there was some urgency in the completion of the pavilion. The plaintiff had been told that

President Reagan was expected to open the pavilion and that timely completion was important. However, this argument was not raised by plaintiff, and plaintiff made at least one request for a change order. This indicates that the need for expeditious action was not so pressing as to prevent petition for formal governmental approval of the changes discussed at issue. Furthermore, unlike *Urban Pathfinders*, the contract expressly denied the COTR the authority to accept or reject work performed under the contract. In the instant case, the COTR could only "notify the contractor and contracting officer of any deficiencies observed," so that the contracting officer could make any decisions regarding acceptance or rejection any changes to the contract.

In *Wieman v. United States*, 678 F.2d at 214, 230 Ct.Cl. at 573, defendant's acquiescence in and acceptance of the benefits flowing from the directives of the representative contributed to a holding of implied authority. However, the court's holding was also based on the finding that the representative was authorized to tell plaintiff what work to perform and that plaintiff was expected to comply with the representative's directives. In the present case, under the terms of the contract, Mr. Ogul had no right or authority to tell the contractor what work to do.

The statement describing the responsibilities of Mr. Ogul as the Contracting Officer's Technical Representative expressly excludes the authority to bind the government to increased-cost changes in the plaintiff's scope of work, and neither his responsibilities nor the circumstances of this case justify the court's implying such authority. Mr. Ogul was not sent by the contracting officer to act on his behalf. Any deficiencies he might have observed were to be reported to the contracting officer, the government's representative in whom the contract reserved the authority to direct plaintiff's contractual performance.

The court, therefore, concludes that the government is not liable for additional work undertaken by plaintiff solely at the direction of the COTR, Mr. Ogul. It is also not liable for work undertaken at the direction of Mr. McCarty, but could possibly be liable for work ordered by Mr. Chambers, depending on the circumstances.

As Acting Commissioner General of a Section at Commerce, Mr. Chambers exercised authority to represent the government regarding the United States pavilion, and to bind the government to his representations. This was true of his signature on the lease with LWE for the pavilion building, and this was also the case, regarding his decision in January or February 1983 to direct plaintiff to end further pursuit of a theater design without demising walls inside the building shell. The court finds that Mr. Chambers, as a part of the duties of his position, appears to have had the authority to represent the government and to bind the government to his representations and directions, presumably including regarding work to be performed by the plaintiff.[9]

The contract gives almost no information on the responsibilities or authority of the Contract Administrator, Mr. McCarty. It only states that reports and deliverables sent to the Department of Commerce are to be sent to his attention.

### Projection Booth

In addition to installing the glass for the projection window, the film maker, the architect, or the government[10] directed plain-

---

**9.** Although Mr. Chambers was known as Mr. Ogul's superior, the court distinguishes Mr. Chambers' authority from that of the project officer's supervisor in *Urban Pathfinders* 79–1 B.C.A. ¶ 13,709, at 67,259. In *Urban Pathfinders*, the Armed Services Board of Contract Appeals decided that, although the project officer had implied authority to bind the government, the project officer's supervisor did not have such authority in the absence of evidence that he had contractual authority or responsibility with regard to the contract. In the present case, the court feels it is logical to find that Mr. Chambers' responsibilities and authority with regard to the pavilion require a finding that he had authority to bind the government with respect to activities occurring within the pavilion, including work performed by the plaintiff.

**10.** Mr. Wright was not sure who, although he does remember talking with Mr. Ogul about it.

tiff to install a drop ceiling and extend mechanical systems in the projection booth. Installation of the glass was covered in plaintiff's contract with defendant. The total for the work done in the projection booth is $13,650, $3,500 of which was for the glass installation. Plaintiff concedes that it is not entitled to the $3,500. However, the absence of evidence in the record to show that anyone with more authority than Mr. Ogul directed the work makes plaintiff ineligible for compensation for any of the costs claimed for the additional, projection booth work.

### Speaker Brackets

Although, during the sole source phase, the installation of frames for the speakers in the theaters was going to be plaintiff's responsibility, such a requirement was not included in the contract. After Jones had begun its subcontract work, the film maker informed plaintiff that speaker brackets were needed in the theater, and plaintiff was instructed by the government that anything not supplied by the film maker or LWE was the responsibility of plaintiff. The cost of the brackets was $6,000. No evidence was presented to the court to indicate that anyone with authority to bind the government directed this additional work. Plaintiff is not entitled to compensation for this work, done at the behest of an anonymous, perhaps unauthorized individual.

### Acoustical Ceiling and Mechanical System Extension

At the February 27, 1984 meeting, several of D & P's cost saving changes concerned the work in the queuing areas. The "Revised Project Scope: February 29, 1984," sets forth the plan on which the potential subcontractors based their final bids. One of the items in the revised project scope was a suspended acoustic-tile ceiling. This was installed in the queuing area between the queuing corridors and the rest of the pavilion, called "queuing 9." This item is listed on Jones' invoices as "Acoustic Ceiling." The cost was $12,700.

The first item on Change Order "A," dated March 29, 1984, amended the original agreement between D & P and Jones by directing Jones to extend the fire sprinkler heads and HVAC (heating, ventilation, and air conditioning) duct work (called "mechanical systems") through the drop ceiling in the queuing area 9. This work cost $10,000. Mr. Nichols, in an April 30, 1984 interoffice memo analyzing the change orders, stated that the alternative would have been to delete the ceiling and apply acoustic spray to the ceiling area at a cost, according to Jones, of $16,000. These mechanical systems were not a part of the original drawing package or agreement between Jones and D & P. Mr. Wright testified that it was his understanding that the placement of the mechanical systems was the responsibility of the installer of those systems (LWE), and not a part of D & P's work. He discussed this with a government official (he thinks it was Mr. Ogul), who took the position that D & P was in there too late to have others do it, so D & P was directed to do it. On April 6, 1984, plaintiff requested a change order from the government to cover this work. Mr. McCarty wrote the letter of response to Nancy Arnold, dated April 13, 1984, rejecting the request and arguing that it had been Mr. Wright who decided to install the drop ceiling (instead of spraying the existing ceiling) as a means of saving money, and that Mr. Wright had made this decision after the mechanical systems were already in place. No duly authorized government official appears to have ordered the change.

### Exterior Walls in Queuing Corridors

Mr. Wright testified that "the government," based on the expectations of the film maker, directed plaintiff to put one inch of acoustical spray on the inside of the exterior walls of the queuing and exit corridors. This work cost $12,260. Knowing only that some unnamed representative of the government directed this change, the court cannot be certain that the representative was authorized to direct the change. Therefore, plaintiff is entitled to no compensation for item 3 on change order A.

Mr. Chambers later inspected the area and directed plaintiff to cover the spray. Pursuant to Mr. Chamber's order, plaintiff directed Jones to install gypsum dry wall over the sprayed walls. This cost an additional $17,000. Plaintiff is entitled to be compensated for this added work because the court finds that Mr. Chambers was an authorized official with the ability to bind the government.

### Dry Wall Casement

Mr. Chambers also directed plaintiff to refine the appearance of a pipe running through one of the queuing corridors. The dry wall enclosure for the pipe and the matching structure in the other corridor cost $500. Plaintiff is entitled to compensation for this work also, because it was directed by an authorized government official.

### 8. Adjustments

According to plaintiff's post-trial brief, plaintiff claims it is entitled to compensation for the direct expenses which it incurred in the construction of the theaters, etc., plus General & Administrative expenses ("G & A") at the rates suggested by the Defense Contracts Audit Agency in its DCAA Audit Report, plus ten percent profit. (This DCAA Audit Report was admitted into evidence by stipulation of the parties as Plaintiff's Exhibit 40.) In the current proceedings, the defendant has questioned the accuracy of its own DCAA Report, in which the G & A formula is suggested as applicable to plaintiff's claim. As stated earlier, it is clear that the correct determination of an equitable adjustment is not an exact science. In this instance, in the complete absence of a substantiated challenge by the defendant to the accuracy of figures suggested by one of its own agencies, contracted to audit the plaintiff's records, the court finds the plaintiff's request for an equitable adjustment, including the G & A expenses and profit at a rate of ten percent, is reasonable. *See Salem Eng'g & Const. Corp. v. United States*, 2 Cl.Ct. at 809; *Folk Const. Co. v. United States*, 2 Cl.Ct. 681, 689 (1983). The plaintiff is entitled to be compensated for G & A expenses at the rate suggested as appropriate in the DCAA Audit Report of 17% for fiscal year 1983, and 12.6% for fiscal year 1984. Any items disputed by the DCAA in the DCAA Audit Report are to be deducted from the calculation of the base amount to be used, given plaintiff's acceptance of the rates suggested and in the absence of any proof to the contrary in the trial record.

Based upon the type of construction contract involved in this case, the court concludes that the efforts and risks undertaken by D & P itself justifies a standard amount of profit. In fact, 10% is offered as a reasonable profit amount by Professors Cibinic & Nash, authors of a widely used text on government contracts. *Delco Elecs. Corp. v. United States*, 17 Cl.Ct. 302, 334 (1989) (citing J. Cibinic & R. Nash, *Administration of Government Contracts* 480, 518 (2d ed. 1985)). Plaintiffs request for an equitable adjustment, including ten percent profit, is, hereby, held to be reasonable and just.

## B. DEFENDANT'S COUNTERCLAIM

Based on assertions in the contracting officer's final decision, defendant amended its answer to the complaint in this case to assert a counterclaim against plaintiff. In the counterclaim, defendant alleges that plaintiff breached its contract through a failure to deliver all contractually enumerated equipment (as set forth in the technical proposal), and a failure to provide all the material and labor contracted for in exhibit areas three and eight and in the administrative area of the pavilion.

Plaintiff argues that the doctrine of final payment bars defendant's counterclaim, and that the defendant is estopped from asserting the counterclaim. Additionally, plaintiff denies that it breached the contract on the basis that the defendant agreed to the changes made in exhibitry design and components, that the scope of the work was not changed, or that plaintiff is at least entitled to offset the recovery of any savings, as a result of cost-saving changes made against the expense of cost-increasing changes.

■ Plaintiff argues that the doctrine of final payment bars defendant's counterclaim because the government did not bring its claim within a reasonable time. Defendant responds that it filed its claim within a reasonable time. The final payment rule bars the assertion of a claim by either party to a government contract after final payment, if the contract so specifies. The final payment rule is predicated upon express contractual provisions. *American Western Corp. v. United States*, 730 F.2d 1486, 1488 (Fed.Cir.1984). The parties concede, and the court finds, that the contract in the present case does not contain any such requirement. Therefore, the final payment rule is inapplicable.

In cases in which the contract did not specify a deadline for making a claim for equitable adjustment of the contract, the courts have found that such an adjustment must be made within a reasonable time. *American Western Corp. v. United States*, 730 F.2d at 1489 (Fed.Cir.), *Roberts v. United States*, 357 F.2d 938, 946–47; 174 Ct.Cl. 940, 952–53 (1966). In *Roberts*, the Court of Claims held that, in order to be made within a reasonable time, the government's action should be made within such a time as to allow the contractor an opportunity to appeal (1) while the facts supporting the claim are readily available and (2) before the contractor's position is prejudiced by final settlement with its subcontractors, suppliers, and other creditors. If the government does not take its action within a reasonable time, it may be estopped by an act of waiver. *American Western Corp. v. United States*, 730 F.2d at 1489.

■ The facts supporting the government's claim were readily available to both parties when the government amended its answer to include the counterclaim. Indeed, plaintiff makes no argument that the government's timing in bringing its counterclaim has diminished the availability of the relevant facts. Plaintiff also does not suggest that its position has been prejudiced in any way by final settlement with its subcontractors, suppliers, or other creditors. Plaintiff's only assertion is that the relevant facts were allegedly known to de-

fendant nine months before defendant brought its claim against plaintiff. The mere passage of time does not satisfy the conditions required by *Roberts*. The time which elapsed in this case between defendant's discovery of the alleged defects in plaintiff's performance of the contract and defendant's assertion of its counterclaim does not act to bar the filing of and consideration of the counterclaim under the doctrine of final payment, nor should the defendant be estopped by an act of waiver.

Plaintiff argues that defendant is estopped from asserting its counterclaim because defendant failed to inform plaintiff that any money not spent in accordance with the original proposals was to be reserved and returned to defendant following completion of the project and because any money not spent in one exhibit area was spent on another area of the project, with defendant's knowledge and approval.

The government may not be estopped on the same terms as other litigants. *Heckler v. Community Health Servs. of Crawford, Inc.*, 467 U.S. 51, 60–61, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). Nonetheless, plaintiff cannot prevail in its assertion of estoppel against the government without at least demonstrating that the traditional elements of estoppel exist. *Id.* at 61, 104 S.Ct. at 2224. The traditional elements of estoppel are:

(1) The party to be estopped must know the facts;

(2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended;

(3) the latter must be ignorant of the true facts; and

(4) he must rely on the former's conduct to his injury.

*USA Petroleum Corp. v. United States*, 821 F.2d 622, 625 (Fed.Cir.1987) (citation omitted).

■ Of course, in a case involving a contract with the government, "it is essential to a holding of estoppel against the United States that the course of conduct or representations be made by officers or agent of the United States who are acting

within the scope of their authority." *Emeco Indus., Inc. v. United States,* 485 F.2d 652, 657, 202 Ct.Cl. 1006, 1015 (1973). Also, the elements of estoppel presuppose that although the claimant may have a right to claim monies owed (in this case for the exhibitry plaintiff allegedly did not *furnish* ) the party to be estopped engaged in some misconduct which communicated something contrary to the true facts to the party claiming application of the law of estoppel. *See Heckler v. Community Health Servs. of Crawford, Inc.,* 467 U.S. at 60–61, 104 S.Ct. at 2224; *USA Petroleum Corp. v. United States,* 821 F.2d at 625.

In the instant case, under the estoppel test element (1), the defendant, the party to be estopped, knew that the plaintiff had furnished alternative exhibitry and had reallocated the monies from one area of required exhibitry into another area. Nonetheless, under the estoppel test element (2) the party must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is intended and under estoppel test element (4) must rely on such conduct to its detriment. Although the damages claimed in the counterclaim, if proven, might demonstrate detriment, estoppel test element (2) cannot be satisfied in this case. There is testimony in the record that certain government officials on site in Louisiana knew of the changes in the exhibitry and of the reallocation of funds within the various exhibit areas, and that when the pavilion opened the contracting officer, who came to New Orleans for the opening, knew that the changes in exhibitry had been made. There, however, is no indication in the record that a duly authorized contracting officer approved the changes to the contract as signed by the parties, nor that a duly authorized contracting officer or his representative intended, or engaged in conduct which plaintiff had a right to believe was intended, to communicate a waiver of the terms of the contract. Moreover, although the contracting officer may have had knowledge of the changes, the burden was on the plaintiff to obtain approval from the appropriate official. De-

fendant's conduct, to which plaintiff points in support of its estoppel argument, is defendant's failure to promptly notify plaintiff of deficiencies in the project. Simply stated, plaintiff's estoppel argument in estoppel test element two is based on defendant's silence. For silence to be an effective basis for an estoppel, the defendant must have had an affirmative duty to speak. Plaintiff, however, fails to demonstrate that defendant has an affirmative duty in this regard. Responsibility to inform plaintiff of the relevant law is the responsibility of the plaintiff, not of the defendant. In the instant case, plaintiff's failure to prove even the traditional elements of estoppel precludes the court from estopping defendant from raising of its counterclaim.

Defendant claims that plaintiff either failed to deliver, or made only partial delivery of, the electronic equipment systems included in the technical proposal. Additionally, defendant claims plaintiff either did not perform, or performed at a reduced scale the work contracted for in exhibit areas three and eight and in the administrative area. Defendant alleges that, by this failure to perform in accordance with the terms of the contract, plaintiff breached its contract with defendant. Defendant claims entitlement to a refund for overpayment made to the plaintiff for those systems which were not provided.

As a proposed finding of fact included in its post-trial brief, defendant alleges that the contract required plaintiff to provide, among other things, the following equipment in the Pavilion:

a) 5 video disc masters,

b) 1 custom interface system,

c) 2 hard disc drive systems,

d) 1 custom electronic system,

e) 24 Sony LDP–1000 video disc players,

f) 26 Sony 19 inch monitors,

g) 25 Elographic touch sensitive displays,

h) 7 Sony video projectors.

This list of models and quantities is the one included in the plaintiff's cost proposal. In Defendant's Response to Plaintiff's Pre-

trial Submission, defendant had mistakenly asserted that plaintiff's cost proposal included $522,800 for this electronic equipment. Although plaintiff corrected defendant's mistake, in Plaintiff's Pretrial Reply, noting that the proper sum from the estimates in the cost proposal was $622,800, defendant takes credit in Defendant's Post–Trial Brief for having "previously stipulated" that the amount was $522,800. Both parties overlook the fact that the cost for the video disc players was reduced by $9,600 ($400 per player multiplied by 24 players; $3,100 each instead of $3500 each) in the cost proposal revision dated June 6, 1983. This reduction was incorporated into the amount of the contract. Thus, the cost proposal total for this list is $613,200, instead of $622,800.

Although the alleged total cost of the equipment in the above list remains the same, when this eight-item list was transferred to the argument included in Defendant's Post–Trial Brief, (d), the "custom electronic system" (a $3,000 item) is omitted without explanation.

Defendant's numbers included in its post trial brief do not compute. Defendant acknowledges that plaintiff supplied one video disc master and eight Elographic touch displays, a total value of $82,232 (including $5,000 for the mastering of the disc which was donated by RCA), which defendant claims as a credit against the cost of the equipment allegedly included in the contract ($522,800) to arrive at a liability of $540,568. Apparently, defendant reneges on its "stipulation," and used the $622,800, number because $622,800 minus $82,232 equals $540,568.[11]

Defendant also alleges that plaintiff accrued contract deficiencies of $318,000 in Area Eight, $37,250 in Area Three, and $18,000 in the administrative area. The deficiencies for Areas Eight and Three were calculated by subtracting the estimate of an independent exhibits professional who reviewed the areas, from the amounts plaintiff set forth in the cost proposal.[12] The amount for the administrative area is based on the requirement in the contract that plaintiff paint and finish wall surfaces in that area. Defendant baldly asserts that "[t]hese areas approximated 20,000 square feet. This equates to $18,000 in labor and material." Testimony at trial informed the court that a "Mr. Dick Dickson," about whom we otherwise know nothing, is the one who "put these figures together" regarding the administrative area. In total, in its counterclaim, defendant claims entitlement to a total of $813,818, plus interest, for deficiencies alleged.[13]

Plaintiff does not dispute the facts presented by defendant regarding its counterclaim. Instead, plaintiff responds by pointing to additional facts and factors not considered by defendant. Plaintiff emphasizes that the contract called for plaintiff to design, as well as to construct, the exhibitry. Plaintiff also argues that defendant participated in, agreed to, and, in some cases, instigated the changes in the design plans. Furthermore, plaintiff argues that defendant, in calculating its alleged counterclaim damages, failed to consider whether plaintiff had enhanced exhibitry in some areas, which might merit offsetting any savings in other areas of the pavilion.

Plaintiff responds to defendant's allegations regarding the work not done in the administrative area by contending that, although the contract "contemplated" that plaintiff would complete the work, defendant did not "require" it of plaintiff during the performance period. Plaintiff's argument that any savings made in one area

---

**11.** This amount should be $530,968, when adjusted for the $9,600 reduction noted above.

**12.** Defendant's expert estimated the cost of construction for area 8 as $150,000. Defendant asserts, supposedly according to plaintiff's cost proposal, that the cost of area 8 is $468,000. Hence, defendant says the net deficiency is $318,000. Actually, the cost proposal states the subtotal for that area is $498,554. Thus, the

deficiency for this area would be properly calculated at $348,554.

**13.** Once again, defendant makes a miscalculation: the sum of defendant's figures is $913,818 ($540,568 + 318,000 + 37,250 + 18,000) instead of $813.818. However, adjusted by the correct-correct noted above, the total of defendant's claim should be $934,772 ($530,968 + 348,554 + 37,250 + 18,000).

were expended in another is also claimed as applicable to this claim.

As stated earlier, the solicitation and plaintiff's technical proposal, as revised, were incorporated into the contract, whereas the cost proposal was not made part of the original contract. In both the solicitation and the technical proposal, there are statements regarding the work plaintiff contracted to perform. The section of the solicitation on the Scope of Work, General Requirements states:

> The contractor shall develop the final design (drawings and specifications) and acquire and/or fabricate and install all exhibits and thematic components deemed necessary to enhance the United States Pavilion.

The Scope of Work goes on to describe the pavilion, in general terms, stating that "The Pavilion shall utilize state-of-the-art interactive computer/video technology distributed throughout the display areas."

The reception area, later known as "Area Three" in the technical proposal, received particular attention in the Scope of Work:

> The Introductory Area is followed by a *Reception Area,* where
>
> visitors are greeted by the President's message of welcome and which houses an information counter. A directory orients the visitor to both the thematic and the spatial organization of the building. Also included in this area is a display recognizing the contributions made to the Pavilion by various donors. An orientation to the special 3–D movie is also presented.

(Emphasis in original.) The exhibit areas, however, are only described by suggestions of subject areas to be treated in the exhibit areas.

The work under the contract was to be completed in four phases, each of which is described in the solicitation. During Phase I, the work to be done on artifacts, displays and graphics is described as follows:

> Development of designs for fabricated displays, including selection of presentation medias and materials. Submission shall include models, drawings and visual presentations sufficient to illustrate final design, along with fabrication and installation cost estimates, and a schedule of work for Phases II and III.
>
> Development of complete graphics program. Submission shall include content outlines, models and drawings sufficient to illustrate final design, along with production and installation cost estimates, and a schedule for Phase II and III work.

Phase II called for the submission of final drawings and specifications, updated cost estimates, and a construction schedule. Fabrication, construction, and installation were to be done during Phase III. Phase IV covered maintenance of the exhibitry during the course of the Fair. The solicitation's Statement of Work regarding "Computer/Video Systems; Audio/Visual Equipment" describes, in general terms, the standards of quality and design. However, there were no specific requirements regarding the electronic equipment to be supplied.

In the Introduction to the technical proposal, plaintiff qualified the finality of the proposal's contents: "In reviewing our thoughts, please keep in mind that they remain highly conceptual and need to be validated through the normal schematic design effort."

The "Exhibit Scenario" for Area Three gives a general description of the area:

> Stepping off the [entry] walkway, visitors circulate in approximately 1600 sq. ft. of Reception Area lobby, staffed by Pavilion personnel and supported by graphics describing the content of the Pavilion, conveying the welcoming message from the President and providing Donor information. Those who need special services, access to restrooms or other facilities would be addressed at this point. A count-down clock for the theater indicating waiting times and the subject of the film would be provided as well.

The descriptions of the other areas explain the topic, information content, and planned ambience for each, but details of exhibitry, equipment, and physical content are not mentioned.

A separate section of the technical proposal discusses the computer-video systems. In the overview of this section, plaintiff proposes to use Apple computers, Sony monitors and video disc players, and Elographic touch sensitive displays, as it had done in the United States pavilion in Knoxville. The solicitation mentions that donations from Apple and Sony might be available. These manufacturers had made donations for the Knoxville pavilion in 1982. The solicitation noted, however, that the contractor would have to provide all necessary equipment, as a part of the awarded price of the contract, regardless of whether any donations were received. Plaintiff did include the cost of this equipment in its cost proposal and in its price bid.

The section of the technical proposal on the computer-video systems goes on to give some detail regarding the systems to be used in Areas Four, Five, and Six. To support a three-screen video debate system in Area Four, plaintiff stated its intent to use three large television monitors, a video disc player, a touch sensitive display and computer. In one part of Area Five, there was to be a theater with two projection televisions and a polling system, and in another part of Area Five, two "video towers" with touch sensitive displays. Area Six was to use sixteen touch sensitive displays, computers, and video discs, and four large video projectors connected by a computer network. The quantity of equipment described in the technical proposal does not add up to that projected in the cost proposal, although some of the difference may be accounted for by the spare equipment plaintiff planned to have on hand for use in the event of equipment failure.

As a part of its proposal, plaintiff provided a performance chart for work on the computer/video disc system. As revised on June 4, 1983, under the heading "Computer/Video Hardware," the performance chart gives the following dates:

1. Project Start—June 15 [1983]
2. Research, Concept Design—June 15 —July 15

3. Hardware Selection, System Development, Sponsorship, System Integration—July 15—September 30

As these excerpts from the contract amply demonstrate, the contract is one for design, as well as for fabrication.

### 1. Electronic Equipment

As acknowledged by plaintiff, the electronic equipment installed in these areas did not correspond with the description of the equipment in the technical proposal. Thinking that the debate system in Area Four and the polling system in Area Five were somehow connected, a witness for plaintiff testified that the government asked plaintiff to come up with an alternative to the "debate and polling system." A witness for defendant testified that a debate and polling system, which had been used in the Knoxville pavilion, was unsuccessful, and that the government did not want such a system used in New Orleans. In Area Four, instead of the video debate system, plaintiff designed and fabricated six independent interactive video games, including synthesized voice programming, which utilized twelve monitors and six computers. In Area Five, plaintiff created and installed four interactive computer/video quiz systems, apparently in place of the theater and polling system. Six interactive history video systems replaced the video towers in the other part of Area Five. Defendant's counterclaim notes no identifiable objection to this change. Plaintiff supplied ten video disc players, ten computers, and ten monitors in Area Five.

In Area Six, plaintiff provided two interactive computer/video systems, in place of a "single interactive display with multiple terminals." The "single interactive display with multiple terminals" apparently refers to the sixteen interconnected displays, computers, and video disc players contemplated in the technical proposal. Defendant's counterclaim for the touch sensitive displays, monitors, and video disc players, at least in part appears to relate to this area. Plaintiff supplied three video disc players, 27 monitors, and two touch sensitive displays in Area Six. In Areas Four, Five, Six, and Seven, plaintiff provided the fol-

lowing totals: 21 video disc players, 63 monitors (15″ and 25″), and 16 touch sensitive displays, not including spare machines. According to the plaintiff, this compares with 21 video disc players (including one video tape player), 23 monitors, 6 video projectors, and 21 touch sensitive displays projected in the cost proposal.

Plaintiff explains that the monitors and disc players used were RCA, instead of Sony, because defendant had accepted a donation of equipment from RCA and insisted on their use. The donation was accepted, despite plaintiff's objection that the RCA equipment might not be as reliable and would require extensive, and expensive adaptive work by plaintiff for integration and use.

When interpreting a contract, effect should be given to the contract so as to attain the factual result that the parties intended to produce. 3 A. Corbin, *Corbin on Contracts* § 545 (1960); see also Restatement, (Second) Contracts § 202(1) (1981). The challenge is to ascertain the intent of the parties. The court's responsibility is to interpret the contract as a whole. Restatement, (Second) Contracts § 202(2) (1981).

The intent of the defendant, as expressed in the terms of the solicitation, was to enter into a contract for the design, fabrication, installation, and maintenance of exhibitry for the pavilion. The solicitation sought proposals of ideas and concepts which would later become designs and exhibitry. The only statement in the solicitation regarding electronic equipment specifies "state-of-the-art interactive computer/video technology." No mention is made of any particular items or quantities of such equipment.

Plaintiff's intent, as manifested in the technical proposal, was to propose to defendant exhibitry concepts, not specifics. Later, during the performance of the contract, plaintiff planned to research, to develop and, finally, to build the structures represented in the designs formulated from these concepts. The contract did not bind the plaintiff to set quantities of certain models of specific machines, prior to July

15, 1983 (a month after the award of the contract), the date upon which plaintiff proposed in its technical proposal to begin working on "hardware selection, system development, sponsorship, and system integration." "Research, concept design" was to take place in the intervening month between the signing of contract and July 15, 1983. It is significant that the description of the work phases contained in the solicitation likewise indicates that development of designs for the displays and selection of media and materials was to occur after the contract was awarded. The Introduction to the technical proposal confirms the tentative nature of plaintiff's proposal. In the proposal these concepts are called "thoughts," which then were still "highly conceptual" and "need[ed] to be validated through the normal schematic design effort."

Defendant lists equipment plaintiff did not deliver. However, as defendant acknowledges, the items on that list were taken from plaintiff's cost proposal, which document was not integrated into the contract, although it does specify and quantify the expenses plaintiff anticipated in the various areas of the pavilion.

▪▪▪ Defendant declares that the government is entitled to strict compliance with contract specifications, and that the government does not even have to accept something better than that which it contracted to receive. *Good Constr. Co.*, 86–2 B.C.A. (CCH) ¶ 18,912 (March 25, 1986) The court agrees with these principles of law, but finds they do not control in the case at bar. These principles do not apply to contracts, such as the one at issue. The contractor's responsibilities were to develop the plans and specifications for the exhibitry it would later fabricate. Defendant's list taken from the cost proposal is not one of contract specifications, with which plaintiff has failed to comply.

The cost proposal, which was not integrated into the contract, is admissible as parol evidence to give insight into the intent of the parties to the award. (*See* the parol evidence rule discussion, above). The itemized content of the cost proposal

served the purpose of enabling the contractor to make a rational estimate of the costs it would incur if it were awarded the contract. It also provided a means for the government to appraise the contractor's estimate.

If Sony had donated the equipment plaintiff intended to use, it is doubtful that defendant could have recovered the value of the equipment, because the contract was issued as a firm, fixed-price contract. In a firm fixed price contract, "the contractor, being bound to complete the work at a fixed price, bears the risk of unforeseen costs in the contract. But the contractor can also gain higher profits by devising ways to save costs." J. Cibinic & R. Nash, *Formation of Government Contracts* 715–16 (2d ed. 1986). Therefore, given the nature of the contract as executed, and defendant's responsibility for having accepted the RCA donation, it would be contrary to the parties' allocation of risk to require plaintiff to return to defendant the projected cost of the Sony machines replaced by donated equipment. The solicitation warned plaintiff to include amounts for the purchase of such equipment, since it was not then known whether any equipment would be donated.

It should also be noted that any savings which accrued from the donation of equipment is, at least in part, illusory. Prior to the award of the contract, plaintiff had projected using software and hardware (some of which was to be available as government-furnished equipment) it reasonably intended to use with the Sony equipment. The donation of the RCA equipment, accepted by the defendant, made it necessary to develop and acquire for that RCA equipment different hardware and software than that already prepared for the Sony equipment.

Although the numbers in defendant's counterclaim are taken from the cost proposal, which was not incorporated into the contract, for the reasons discussed above, the court evaluates the merits of the claim based on the actual terms of the contract. Considering the intent of the parties and the defendant's acquiescence to, and perhaps approval of, defendant's development of alternatives to the debate and polling ideas, the court concludes that defendant has failed to carry its burden of proof in demonstrating that plaintiff did not comply with its obligations under the contract in the equipment it fabricated and installed in Areas Four and Five.

Defendant similarly fails in its allegations concerning the equipment in Area Six. Many more monitors were supplied than originally proposed. Fewer disc players were supplied, however, from the sparse technical evidence presented to the court, it is not possible to make a comparison between the quantities supplied and those proposed. Provision of two touch sensitive displays, as opposed to the sixteen projected, has not been proven as breaching the contract. Moreover, defendant has not complained that the exhibitry was inferior to that which the technical proposal led it to believe it would receive. Defendant has failed to prove that it was contractually entitled to sixteen displays in Area Six, regardless of other considerations.

■■■ In addition to the items in defendant's counterclaim which have already been discussed, defendant contends that four video disc masters and two hard disc drives also were not delivered. These items were not mentioned in the technical proposal, and thus were not a part of the contract. The court, for the reasons discussed above, finds that the plaintiff was not contractually obligated to deliver them. Furthermore, the court sees good reason to excuse their non-delivery. RCA stopped making video disc masters after making the one master which plaintiff did deliver. A contract does not have to expressly provide that if performance subsequently becomes impossible or impracticable, then the parties are excused from their obligations because the law implies this as a condition subsequent. *Ordnance Research, Inc. v. United States*, 609 F.2d 462, 479, 221 Ct.Cl. 641, 670 (1979) ("When design specifications are furnished by the government, evidence that the contractor utilized the particular materials and followed the methods specified is often enough to establish per-

formance impossibility or impracticability for which the government, as creator of the specifications, is responsible.") In this case, the government required the contractor, D & P to use the donated RCA equipment. D & P was unable to produce the contracted for disc masters due to a change in circumstances, (RCA no longer produced the masters), which was an unforeseeable change or unanticipated event for which the contractor, carrying out the government's direction to use the RCA equipment instead of the plaintiff's proposal to use SONY equipment, did not contractually assume the risk and should not be held accountable.

Unable to deliver the rest of the programming information on disc, plaintiff alleges (and defendant does not dispute) that it provided it on video tape. Defendant received the work, simply in a different medium. Plaintiff presented uncontradicted evidence that the two hard drives were unnecessary due to changes plaintiff made in the integration of the equipment.

The court, therefore, finds that the defendant's counterclaim for undelivered electronic equipment is defeated by the lack of specificity in the terms of the solicitation, the expressly tentative nature of the contents of the technical proposal, and the fact that defendant contracted for the design of the exhibitry, as well as for its fabrication and installation.

### 2. Areas Three and Eight

A similar analysis and conclusion applies to the alleged deficiencies in contract performance claimed by the defendant regarding Areas Three and Eight. In its counterclaim, defendant argues that it contracted for a specific dollar value of work in these areas. Once again, defendant places improper reliance on the cost proposal.

The Scope of Work, included in the Solicitation, directed that the Reception Area (Area Three) present the President's message, orient the visitors to the organization of the building, including the movie, and recognize contributions of donors to the pavilion. The technical proposal carried the description a step farther, including such detail as the square footage of the area, access to restrooms or other special facilities, and a clock to show waiting times for the theaters. The solicitation makes no identifiable reference to what would later be called Area Eight. The technical proposal states only the theme, general objectives, and conceptual content for Area Eight. The solicitation's description of phases I and II confirms that the actual design, presentations, and specifications are to be specifically determined after the contract is executed.

The cost proposal, on the other hand, which was not integrated into the contract, quantifies the expenses plaintiff anticipated in the various areas of the pavilion, however, in this document, no details of the actual work to be performed are mentioned. Regarding Area Three, 2,000 hours of labor ($37,995), material ("primarily wood and finishing," $11,505), and undescribed work by Barry Howard and Associates ($12,750) are listed. For Area Eight, various costs are listed for labor, materials, and unspecified subcontracted efforts (totalling $498,544).

As previously mentioned, defendant calculates its claim in these areas on the estimates of an exhibits professional whom defendant employed to appraise the areas. The claim amounts are the differences between plaintiff's cost estimates and the appraisals. The earlier discussion regarding the nature of the cost proposal and its relationship to the contract also applies to these claims. As such, the court is lead to the conclusion that defendant's claims for compensation, based on a reduction in work in these areas is unfounded. Any difference between the cost proposal and actual work performed would be the prerogative of the plaintiff to "design" the final product of the contract.

Not only are the claims in Areas Three and Eight defeated by their lack of basis in the contract, but the reductions, of which defendant complains, appear to have been authorized, if not instigated by government officials. At a meeting in November 1983, plaintiff's subcontractor presented to Mr. Chambers a proposal for work in Area Eight. In response, Mr. Chambers sug-

gested that the area be scaled back, making it more of a restful art gallery. At the direction of Mr. Chambers, the finished product in Area Eight was significantly different from its original plan.

In Area Three, plaintiff acknowledges that the reception desk, mentioned in the technical proposal, was not installed. This is the only specific item mentioned in the contract which, by evidence presented to the court, was proven to have been omitted from the completed project. However, it was Mr. Chambers, again, who ordered the reduction in work. He directed plaintiff to omit the planned reception desk from the area. As previously decided regarding other claims against this contractor, defendant has failed to carry its burden of proof to establish that the work done by plaintiff breached its contractual obligations.

Mr. Ogul inspected and accepted for the government Areas Three and Eight on May 13, 1983. The inspection forms he signed did note some minor problems, however the items noted are not discernably related to defendant's claims regarding the areas. These forms, while not legally preventing defendant from raising its claims, do reinforce the court's conclusion that the work done in these areas coincides with both parties' intentions for the areas.

### 3. Administrative Area

▮ Although plaintiff seems to argue that the contract does not specifically require that plaintiff paint or finish the walls of the administrative area, and that the D & P proposal was intended to be further developed during the course of performance, it was plaintiff who introduced into evidence the contract, which plainly states, "[c]ontractor ... shall provide painting or finishing of wall surfaces" in the administrative area. Plaintiff apparently seeks to excuse this failure by suggesting that it is somehow the same as the other changes it made in development and performance on the contract. The only argument offered by plaintiff is that, even though this particular item of work was not done, the money was spent by plaintiff on enhancements elsewhere. As support, plaintiff directs the court's attention to the DCAA audit

which reported, in essence, that plaintiff spent on the pavilion all the money the government allocated for the project.

This argument, however, does not excuse plaintiff from liability for failing to perform work it contracted to produce. While the contract's electronic equipment specifications were to be developed after the contract award, and did not specify the work to be done in Areas Three and Eight, the contract, when executed, did expressly require plaintiff to paint or finish the walls of the administrative area. To allow substitution of this work by work in another area of the pavilion would contravene the rule against substitute performance. *See, e.g., Red Circle Corp. v. United States,* 398 F.2d 836, 185 Ct.Cl. 1 (1968). Plaintiff should be held liable for failure to paint the walls in the administrative area.

Nonetheless, the evidence which defendant submitted to the court is wholly inadequate to prove the amount of damages resulting from plaintiff's failure to paint the walls in the administrative area and the court is, therefore, unable to make defendant an award in this category. At trial, through the testimony of Mr. Ogul, defendant asserted that the value of this work is $18,000. Mr. Ogul testified that the $18,000 dollar figure was the product of the estimates of a Mr. Dick Dickson. Nothing more was presented to the court to substantiate the basis for this evaluation. Nor was the court informed as to the qualifications of the alleged evaluator, Dick Dickson. Thus, the defendant has failed to provide the court with sufficient evidence to allow the court to determine the appropriate award. The issues of liability and damages were clearly tried jointly in this case and not bifurcated. The court can, therefore, assume that the defendant did not have additional information available, or surely it would have provided it at trial.

### III. CONCLUSION

The court hereby GRANTS in part and DENIES in part plaintiff's claim for an equitable adjustment of the contract price. The court finds that certain items of work performed by plaintiff, through its subcon-

tract with J.A. Jones Construction Co., were outside the scope of the contract as signed, by the plaintiff and the defendant, were duly directed by an authorized, responsible government official, and, therefore, that the plaintiff is entitled to an equitable adjustment for those items of work. Those items of work are, as identified in Jones' subcontract bid and invoices or Change Orders issued to Jones: "Drywall" for the theater walls ($358,000), "Acoustical Spray" (to the extent that plaintiff has not already been compensated by defendant for this work; $187,000 less $36,785), "Painting" ($42,850), installation of the "Hardware" of the theater doors (less the amount for deletion of the installation of the doors themselves; $2,560 less $1,280), construction of a gypsum wall along the exterior walls in the queuing and exit corridors ($17,000, Change Order "C"), and a drywall casement around a water pipe in a queuing area and a similar structure in opposite area ($500, Change Order "D"). In addition, plaintiff is entitled to receive compensation for the invoice category "Insurance, Bonds, and Permits" ($18,068), and for General & Administrative expenses (at the rate included in the DCAA audit report of 17% for fiscal year 1983 and 12.6% for fiscal year 1984, in accordance with the DCAA Advisory Audit Report on evaluation of costs claimed, plaintiff's exhibit 40), as well as a 10% reasonable profit. Plaintiff is not entitled to an equitable adjustment for the following invoice work categories and change orders: "Projection Booth," "Speaker Brackets," "Handrails," "Acoustical Ceiling," "Carpet," "Electrical," and other sections of Change Orders "A" and "B" not discussed above. The total amount due plaintiff shall include interest in accordance with the Contract Disputes Act, 41 U.S.C. § 611 (1982). The court hereby DENIES defendant's counterclaim.

The parties are to submit to the court, within 14 days of the issuance of this Opinion, a Joint Stipulation detailing the dollar amount of damages to which the plaintiff is entitled in accordance with this Opinion, including the G & A expenses and a 10% reasonable profit. Upon receipt of the stip-

ulation, the Clerk of the Court will enter final judgment in the case.

IT IS SO ORDERED.